ESTATE OF JOHN G. STOLL, DECEASED, SECURITY TRUST COMPANY, EXECUTOR, AND VIRGINIA D. STOLL, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

LEXINGTON HERALD-LEADER CO., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 77166, 77167. Filed May 9, 1962.

---

*James Park*, Esq., *Joseph L. Rothchild*, Esq., and *Gayle A. Mohney*, Esq., for the petitioners.

*Hubert E. Kelly*, Esq., for the respondent.

BRUCE, *Judge:* Respondent determined deficiencies in petitioners' income taxes and additions to taxes for the years and in the amounts which follow:

| Docket No. | Taxable years | Deficiency | Additions to tax | |
| --- | --- | --- | --- | --- |
| | | | Sec. 293(b), I.R.C. 1939 | Sec. 6653(b), I.R.C. 1954 |
| 77166 | 1953 | $335,626.88 | $167,813.44 | |
| | 1954 | 219,445.55 | | $109,722 78 |
| | 1955 | 45,950.84 | | 22,975.42 |
| | 1956 | 108,516.38 | | 54,258.19 |
| 77167 | 9/30/54 | 54,843.52 | 27,421.76 | |
| | 9/30/55 | 32,456.50 | | 16,228.25 |
| | 9/30/56 | 33,578.88 | | 16,789.44 |

By their supplemental stipulation of facts the parties have limited the issues to the following: (1) Whether the transfer by John Stoll of the assets of his newspaper business with a basis of $663,879.95 to the Lexington Herald-Leader Co. in exchange for all of its stock and the assumption by it of his liabilities in the amount of $1,015,000 was a nontaxable exchange within the provisions of section 112(b)(5), I.R.C. 1939;[1] and (2) whether there was a valid assumption of the indebtedness by the corporation so that principal and interest payments made by the corporation toward the liquidation of the liabilities did not constitute distributions in the nature of dividends.

FINDINGS OF FACT.

Some of the facts have been stipulated and are incorporated herein by this reference.

Petitioners in Docket No. 77166 are the Estate of John G. Stoll, Deceased, Security Trust Company, of Lexington, Kentucky, Executor, and Virginia D. Stoll (sometimes hereinafter referred to as Virginia). John G. Stoll (sometimes hereinafter referred to as Stoll) and Virginia were husband and wife and resided in Lexington, Kentucky. They filed joint Federal income tax returns with the district director of internal revenue for the district of Kentucky for the years 1953 through 1956 on the cash basis of accounting. Stoll died testate on August 26, 1959. Besides Virginia, by whom he had no children,

---

[1] Hereinafter, section references will be to the Internal Revenue Code of 1939 unless otherwise indicated.

he left surviving him three daughters by a former marriage, 12 grandchildren, and 23 great-grandchildren.

The joint Federal income tax returns filed by Stoll and Virginia for the years 1953 through 1956 reflect the following details.

| | 1953 | 1954 | 1955 | 1956 |
|---|---|---|---|---|
| Salary, Lexington Herald-Leader, Inc. | $8,333.34 | $50,000.00 | $50,000.00 | $50,000.00 |
| Dividends | 7,719.90 | 21,187.96 | 32,869.08 | 115,305.49 |
| Interest income | | 1,201.92 | 658.29 | |
| Net profit from operation of Lexington Herald-Leader, a proprietorship | 529,967.48 | | | |
| Gain (loss) from sale or exchange of property | | (379.34) | | 6,512.61 |
| Net rental income | 22,138.86 | 32,121.54 | 32,865.18 | 33,678.66 |
| Other income | 7,695.93 | 3,816.00 | 1,548.30 | 2,241.21 |
| Adjusted gross income | 575,855.51 | 107,948.08 | 117,940.85 | 207,737.97 |
| Less: Itemized deductions | 66,413.63 | 26,609.17 | 28,353.09 | 31,447.32 |
| | 509,441.88 | 81,338.91 | 89,587.76 | 176,290.65 |
| Less: Personal exemptions | 1,800.00 | 1,800.00 | 1,800.00 | 1,800.00 |
| Taxable income | 507,641.88 | 79,538.91 | 87,787.76 | 174,490.65 |
| Joint Federal income tax liability | 420,462.52 | 38,564.35 | 43,298.79 | 105,673.67 |
| Paid by: | | | | |
| Withholding | 2,083.34 | 12,500.04 | 12,500.04 | 12,500.04 |
| Declaration of estimated tax | 460,000.00 | 66,862.46 | 27,500.00 | 31,000.00 |
| Overpayment credited and/or refunded | 41,620.82 | 40,798.15 | | |
| Balance of tax paid | | | 3,298.75 | 62,173.63 |

John Stoll was born in Lexington, Kentucky, on September 7, 1878. His father and grandfather before him were associated in the ownership of the Lexington Leader, a daily afternoon newspaper, from the year 1884. Stoll acquired sole ownership of this newspaper in 1921 and continued its operation as a sole proprietorship.

On September 15, 1937, Stoll purchased, for $407,200, the Lexington Herald, a morning newspaper published in Lexington, and the following entries were recorded on the proprietorship books of account for the newspaper business:

| | Debit | Credit |
|---|---|---|
| Equipment | $82,300 | |
| Associated Press Debentures | 250 | |
| Associated Press Membership | 10,000 | |
| Goodwill | 314,650 | |
| John G. Stoll Capital Account | | $407,200 |

On September 15, 1937, Stoll caused bonds to be issued in the total amount of $500,000, known as The Lexington Leader-The Lexington Herald (John G. Stoll, Owner) 5% Serial Bonds, which were secured by a first mortgage upon the Lexington Leader building owned by him, a first mortgage on all of his printing presses, machinery, and equipment used in the printing and publishing of its newspapers, and by an assignment of $200,000 of the proceeds of a life insurance trust created by him on August 3, 1932, with the Security Trust Company, of Lexington, Kentucky, as trustee. Thereafter, on Septem-

ber 15, 1944, Stoll refinanced this bond issue with a new issue of $600,000 of 5-percent serial bonds, using the same security. As of October 31, 1953, there were bonds of this issue unpaid and outstanding in the principal amount of $184,500 and accrued interest of $4,612.50.

From September 15, 1937, until October 31, 1953, Stoll carried on his newspaper business under the name of the Lexington Herald-Leader Co., John G. Stoll, Proprietor, publishing the Lexington Herald as a morning newspaper, the Lexington Leader as an afternoon newspaper, and the combined Herald-Leader as a Sunday newspaper. He maintained separate books of account for his proprietary newspaper business on an accrual basis of accounting.

Petitioner in Docket No. 77167 is the Lexington Herald-Leader Co. (hereinafter sometimes referred to as the corporation), a corporation organized and incorporated under the laws of Kentucky on October 29, 1953, with an authorized capital stock of 1,000 shares of no-par value. Its principal place of business is in Lexington. The corporation is authorized to engage in the business of printing, publishing, distributing, and selling newspapers and other related activities. It maintains its books and files its Federal income tax returns on an accrual basis, and for a taxable year ending September 30. For each of its taxable years ended September 30, 1954, through September 30, 1956, it filed Federal income tax returns with the district director of internal revenue for the district of Kentucky.

Prior to the years in question Stoll's legal affairs were handled by Gayle A. Mohney (hereinafter sometimes referred to as Mohney) in conjunction with John Stoll's brother, Richard C. Stoll, until the latter died in 1949, of the law firm of Stoll, Muir, Townsend & Park, in Lexington. Mohney had known Stoll since 1924, and by being his attorney over the years had become familiar with his financial affairs.

Sometime in the late spring of 1953, Stoll expressed concern to Mohney over the affairs of his estate in the event of his death. At that time Stoll was approaching 75 years of age and recognized that he was at the point in life when something could suddenly happen to him. Stoll had always taken great pride in owning and publishing the Lexington Herald-Leader newspapers and desired to preserve intact their ownership and provide for their continued operation in the event of his death. He wanted a practical means of operation which would provide for his wife and family. He also wished ownership and operation of the newspapers to be continued by his estate after his death because he had many faithful employees who had been with him for 25 to 40 years and who had contributed materially to the successful operation of the newspapers.

Stoll reminded Mohney of his domestic situation; that he had been married three times; that his first wife had died; that he and

his first wife had had four daughters, one of whom had since died leaving children surviving her; that he had been divorced from his second wife in the early 1930's; and that he was presently happily married to Virginia. He reviewed generally with Mohney his assets and liabilities. He estimated the value of real property owned by him at $465,000 and securities at $50,000. In addition, he owned the assets of his proprietary newspaper business. His liabilities were as follows: A note to the First National Bank of Louisville, Louisville, Kentucky, in the principal amount of $415,000; a note to the First National Bank and Trust Company, Lexington, Kentucky, in the principal amount of $75,000; a note to the Security Trust Company, Lexington, Kentucky, in the principal amount of $50,000; liabilities for the outstanding The Lexington Leader-The Lexington Herald 5% Serial Bonds in the principal amount of $184,500; and potential current income tax liability for 1953, the exact amount of which he did not know but realized would be substantial.

Stoll knew that the assets of his proprietary newspaper business constituted personal property under the laws of Kentucky. He also had been advised by Mohney, and Edward S. Dabney and H. L. Austin, president and vice president, respectively, of the Security Trust Company (hereinafter referred to as Dabney and Austin, respectively), that, regardless of what provisions he made for Virginia in his will, she could renounce the will and take one-half of his personal property at death absolute and one-third of his real estate at death for life. Stoll told Mohney that he wanted to be fair to Virginia on the one hand and to his children and grandchildren on the other. He recognized that if Virginia were advised after his death to renounce his will, thereby taking one-half of his proprietary newspaper business absolute, the operation and management of the newspapers would be equally divided between Virginia and the fiduciary of his estate, a situation which he considered undesirable. Even assuming Virginia would not renounce his will, he did not believe his estate would contain sufficient liquid assets to pay his liabilities. He expressed the concern that under either of these circumstances the executor of his estate might have to sell his proprietary newspaper business, which he wanted to prevent.

Stoll had been associated with Dabney for many years as a member of the board of directors of the Security Trust Company, and Dabney had been his long-time financial adviser. Dabney and Austin had advised Stoll to form a corporation and transfer the operating assets of his proprietary newspaper business to the corporation and have it assume his liabilities. Dabney and Austin were of the opinion that by so doing Stoll could preserve the control and the management of the newspaper business in a corporate form by making gifts in trust of some of the corporation's stock for the benefit of his children and

grandchildren, thereby preventing Virginia from acquiring a 50-percent interest in the newspaper business in the event of her renunciation of his will. In addition, they were of the opinion that by so doing Stoll would relieve the fiduciary of his estate of any possible personal liability which could be incurred in the operation of the newspapers as a proprietorship, and that by allowing the corporation to assume his liabilities the fiduciary of his estate would be relieved of immediate pressure at his death insofar as their liquidation was concerned.

Stoll had been carefully considering the recommendations made to him by Dabney and Austin, but he had not made up his mind as to what he would do. He asked Mohney to consider the factors he had discussed with him and to confer with Dabney and Austin about the situation.

Mohney had numerous conferences with Dabney and Austin about the situation. Stoll participated in many of these conferences. The question of the administration of Stoll's estate was discussed frequently. Austin particularly pointed out to Stoll that it would be awkward and impractical for the fiduciary of his estate to operate as a proprietorship a business of the size and scope of his newspaper business. Austin thought the risks and liabilities in operating such a business as a proprietorship were too great for the fiduciary to assume. He strongly recommended incorporation. There was discussed as well the desirability of incorporating from the standpoint of avoiding Virginia's possible acquisition of 50 percent of the operating assets of the newspaper business in the event of her renunciation of Stoll's will.

As a result of these conferences and the study of Stoll's affairs, which included the preparation of estimated cash requirements of the estate upon his death, Mohney concluded and told Stoll that his estate would not have sufficient funds outside of the operating assets of his proprietary newspaper business to liquidate his liabilities and pay the Federal estate and State inheritance taxes. Mohney, Dabney, and Austin advised organization of a corporation and transfer of the operating assets and liabilities thereto to perpetuate a controlling interest in the newspaper business in Stoll's estate. Mohney also advised Stoll not to transfer his real estate to the corporation because by doing so he would, in effect, convert realty into personalty and thereby increase the interest Virginia would acquire in his estate in the event of her renunciation of his will. Federal income tax implications of these proposed transfers had not been discussed in the conferences referred to.

Stoll agreed that the combined recommendations of Mohney, Dabney, and Austin appeared to be the only plan to follow. He requested that Mohney confer with Charles M. Burlingame and Joseph L. Roth-

child (hereinafter sometimes referred to as Burlingame and Rothchild, respectively), his accountants in the firm of Burlingame & Company, Chicago, Illinois, to see if the proposed plan met with their approval. Thereafter, Mohney went to Chicago and discussed the proposal with the accountants, who said that they would review the situation.

On August 20, 1953, Burlingame and Rothchild came to Lexington. A conference was held in Stoll's office which was attended by him, Mohney, Dabney, Burlingame, Rothchild, and Fred B. Wachs, general manager of the proprietary newspaper business (hereinafter sometimes referred to as Wachs). The details of the recommendation were discussed. Rothchild said that he had reviewed Stoll's affairs, and that, based upon the information which he had received from Mohney and which had been accumulated by Burlingame & Company from auditing the books of account of the proprietary newspaper business and preparing prior income tax returns, he had made a study of the proposed plan in the light of Stoll's assets and liabilities and his desire to perpetuate the newspaper business to determine the practicability of the proposed incorporation from an accounting standpoint.

Rothchild said he and Burlingame were of the opinion that the plan was both feasible and practical. Rothchild, upon his own initiative, had looked into the Federal income tax effects of formation of the corporation, transfer of the assets, assumption of the liabilities, and future operations of the corporation. He told Stoll that in his opinion there would be no adverse tax effects on formation, transfer of assets, and assumption of liabilities. He said that taxes to Stoll with respect to subsequent operations would depend on the dividends. Rothchild also told Stoll that in his opinion, regardless of whether the tax effects would be favorable or adverse, the newspaper business should be operated in a corporate form. Stoll said he was favorably impressed with the plan but that he would give the matter further serious thought.

On October 2, 1953, another conference was held in Lexington which was attended by the same individuals who attended the August 20 conference, with the addition of Douglas Potter (hereinafter sometimes referred to as Potter), executive vice president of the First National Bank of Louisville. The recommendations which had been made were explained to Potter. Stoll said he was convinced he should follow through with these recommendations. Potter agreed with this conclusion and said that he was of the opinion that the decedent had no alternative to formation of a corporation and the transfer to it of the operating assets of the proprietary newspaper business in exchange for the capital stock of the corporation and the assumption by it of his liabilities. Stoll thereupon instructed Mohney to prepare the docu-

ments necessary to form a corporation and complete the plan as of the close of business on October 31, 1953.

As Stoll's affairs stood at that time, it appeared that it would have been very difficult for him ever to have paid his liabilities without selling his business. The liabilities to the First National Bank of Louisville, the First National Bank and Trust Co., of Lexington, and the Security Trust Company in the principal amounts of $415,000, $75,000, and $50,000, respectively, were on short-term or demand notes. The indebtedness to the First National Bank of Louisville was secured by an assignment of certain life insurance policies maintained by Stoll on his life, the cash surrender value of which was equal to or in excess of the amount of the loan. Of the $415,000 borrowed from the First National Bank of Louisville, $295,000 was borrowed on August 14, 1939, and used to pay off loans which Stoll had made against his life insurance policies.

At the October 2 conference, Potter recommended that Stoll refinance his liabilities in a single loan, with the exception of the liability which he owed the First National Bank of Louisville. Potter was not concerned with the latter liability, because it was amply secured and he felt sure that his bank would extend the note to allow sufficient time for its retirement. However, Potter was of the opinion that the remaining obligations, especially the demand notes, should be refinanced over a term so that there would be a definite period of time for their retirement.

There was also a discussion of Stoll's Federal and State income tax liabilities for 1953. On the basis of earnings from the newspaper business and other interests from January 1, 1953, to that time, expected earnings from then until October 31, 1953, and the salary and dividends expected to be paid to Stoll by the corporation during the remainder of 1953, Rothchild estimated that the Federal income tax liability would be an additional $310,000 over the amount originally estimated by him. He also estimated the State income tax liability at approximately $5,000.

After the October 2 conference, in line with Potter's suggestion, Mohney conferred with Dabney about refinancing the obligations over a longer term. Dabney suggested not disturbing the liability to the First National Bank of Louisville in the principal amount of $415,000. He recommended that the liabilities to the First National Bank and Trust Co., of Lexington, and the Security Trust Company in the principal amounts of $75,000 and $50,000, respectively, the liability for the outstanding Lexington Leader-Lexington Herald 5% Serial Bonds in the principal amount of $184,500, and the potential additional Federal income tax liability for 1953 be consolidated into a $600,000 loan to be participated in by the First National Bank and Trust Co., of Lexington, the Security Trust Company, and the Louis-

ville Trust Company to the extent of $200,000 by each bank. This loan was to be secured by a mortgage on the real estate on which the proprietary newspaper business was conducted, the personal residence at 1620 Richmond Road in Lexington, residential property owned by Stoll at 1308 Richmond Road, occupied by one of his daughters, and the operating assets and franchises of the newspaper business.

Each of these banks agreed to participate in a $600,000 loan to the extent of $200,000 each. They understood that after the loan was made the operating assets of the proprietary newspaper business would be transferred to a newly organized corporation in exchange for all of its capital stock and the assumption of Stoll's liabilities, including the new loans. Before the Louisville Trust Company would agree to lend $200,000, certain conditions were imposed by it which were the subject of a letter to Mohney from its first vice president, dated October 29, 1953, which reads in pertinent part as follows:

Our participation in the credit will be $200,000, and it is understood that the entire indebtedness will be secured by a first mortgage on the real estate and equipment of the Lexington Herald-Leader, a first mortgage on Mr. Stoll's home valued at approximately $80,000, and a first mortgage on another residence of his valued at about $40,000. It is understood that this indebtedness will be assumed by the Lexington Herald-Leader Corporation and that it will be repaid at the rate of $15,000 quarterly and interest at the rate of 5% per annum with payments to each participating bank on a pro rata basis. A condition of our commitment is that Mr. Stoll will agree that his compensation from the new corporation will be limited to a salary of $50,000 per year and that he will make no other demands for advancements of any kind. The corporation, however, will be at liberty to declare such dividends as it may deem expedient which, of course, will be paid only out of earnings and after all debt requirements will have been made. We will want the new corporation to agree that it will not make any extra payments or advancements to Mr. Stoll over and above the salary of $50,000 per year and such dividends as may be declared as indicated.

There is one further thing which we did not discuss yesterday but which as a matter of protection to all concerned should be included. This has to do with the maintenance by the new corporation of a satisfactory working capital position. It would seem to us that a business with a volume as large as that enjoyed by the Lexington Herald-Leader and with the liabilities which the new corporation will assume, should maintain a net working capital position of at least $300,000. You might talk to Bill Courtney and Ed Dabney about this and also with Fred Wachs and if they all agree, that provision should be inserted as a condition.

On October 29, 1953, Rothchild returned to Lexington. He reviewed the articles of incorporation of the then newly organized corporation, the Lexington Herald-Leader Co., and other documents which Mohney had prepared incident to the transfer of the operating assets of the proprietary newspaper business to the corporation in exchange for all of its capital stock and the assumption of the liabilities. He also prepared an amended declaration of estimated tax for Stoll and Virginia reflecting an estimated tax for 1953 of $460,000

and the amount to be paid with declaration of $310,000. This amended declaration bears the district director's stamp that it was received with the remittance of $310,000 on December 14, 1953, and the records of the district director reflect that the $310,000 payment was assessed on this same date.

As of October 30, 1953, Stoll's known indebtedness and the unpaid estimated Federal and State income taxes of Stoll and Virginia for 1953 were as follows:

First National Bank of Louisville:
 Notes payable on demand and dated as follows:

| | | |
|---|---:|---:|
| Aug. 14, 1939 | $295,000.00 | |
| Feb. 28, 1941 | 35,000.00 | |
| Apr. 17, 1942 | 11,000.00 | |
| Apr. 3, 1946 | 74,000.00 | $415,000.00 |

First National Bank and Trust Co., of Lexington:
 Notes payable on demand and dated as follows:

| | | |
|---|---:|---:|
| Dec. 15, 1950 | 50,000.00 | |
| Dec. 29, 1952 (Original note in the amount of $90,000), balance | 25,000.00 | |
| Accrued interest on above notes | 1,080.56 | 76,080.56 |

Security Trust Company:
 Note payable on demand and dated as follows:

| | | |
|---|---:|---:|
| Dec. 15, 1947 | 50,000.00 | |
| Accrued interest | 694.44 | 50,694.44 |

Lexington Herald-Leader:

| | | |
|---|---:|---:|
| Bonds dated Sept. 15, 1944 | 184,500.00 | |
| Accrued interest | 4,612.50 | 189,112.50 |

Estimated unpaid income tax liability on 1953 income:

| | | |
|---|---:|---:|
| Federal | 310,000.00 | |
| State | 5,000.00 | 315,000.00 |
| Total | | 1,045,887.50 |

None of the liabilities listed above were recorded on the books of account maintained by Stoll for his proprietary newspaper business.

On October 30, 1953, Stoll individually borrowed $600,000, consisting of three loans of $200,000 each, from First National Bank and Trust Co., of Lexington, the Security Trust Company, and the Louisville Trust Company. He gave his personal note to each of these banks in the amount of $200,000. The terms of the notes were the same and provided for repayment in quarterly installments of $5,000, plus interest at 5 percent, on the first day of February, May, August, and November until the notes were retired on November 1, 1958. To secure these loans, Stoll and Virginia executed a mortgage and supplemental mortgage on October 30, 1953, covering the property which previously

had been agreed upon. These new liabilities were not recorded on the books of account of the proprietary newspaper business.

The proceeds from the above loans, amounting to $600,000, were deposited in Stoll's personal checking account at the Security Trust Company. From these funds and $30,751.21 of Stoll's other funds, $76,080.56 was paid to retire the liability to the First National Bank and Trust Co., of Lexington; $50,694.44 was paid to retire the liability to the Security Trust Company, and $189,112.50 was paid to the Security Trust Company as trustee for the holders of the outstanding Lexington Leader-Lexington Herald 5% Serial Bonds for the retirement of the bonds. In addition, $310,000 was used for a certified check drawn by Stoll on his account at the Security Trust Company, dated and certified on October 31, 1953, and payable to the district director of internal revenue for payment of Stoll's and Virginia's additional estimated Federal income taxes for 1953. This check was paid by the Security Trust Company on December 16, 1953. Also, $4,863.62 was used for two checks drawn by Stoll on his personal checking account at the Security Trust Company, the first dated October 29, 1953, for $2,363.62, and the second for $2,500 dated and certified on October 31, 1953, both payable to the State treasurer of Kentucky for payment on Stoll's and Virginia's joint State income tax liability for 1953. The check for $2,363.62 was paid by the Security Trust Company on November 11, 1953, and the certified check for $2,500 was not paid until January 1954.

As of October 31, 1953, Stoll's known existing liabilities, without considering the liabilities listed on the books of his proprietary newspaper business, were as follows:

| Creditor | Amount |
|---|---|
| First National Bank of Louisville | $415,000 |
| The Louisville Trust Company | 200,000 |
| First National Bank and Trust Co., of Lexington | 200,000 |
| Security Trust Company, of Lexington | 200,000 |
| | 1,015,000 |

The first organizational meeting of the corporation was held on October 31, 1953. This meeting was attended by Stoll, Wachs, and Mohney, they having subscribed to all of the corporation's capital stock and having been elected to serve as the company's directors. Stoll presented a written proposal to the board of directors, which reads as follows:

For many years past I have been the owner and sole proprietor of The Lexington Herald and The Lexington Leader, daily newspapers printed and published in the City of Lexington, Kentucky, and the Sunday Herald-Leader, printed and published as a combined paper on Sunday. Attached hereto is a balance sheet of the assets, liabilities and net worth of this business, of which I am the sole owner, as at the close of business October 31, 1953, prepared by Burlingame & Co., Certified Public Accountants, of Chicago, Illinois.

I hereby offer to transfer and convey to your company all of the assets of said business (excepting the real estate) subject to all liabilities except the liability for my own individual income taxes on the following terms and conditions:

1. Your company shall assume all liabilities of said business as at the close of business October 31, 1953, and shall further assume the payment of the following obligations:

(a) My indebtedness to First National Bank of Louisville, of Louisville, Kentucky, in the aggregate principal amount of $415,000.00, evidenced by the following notes:

$295,000   dated August 14, 1939
  35,000   dated February 28, 1941
  11,000   dated April 17, 1942
  74,000   dated April 3, 1946.

The time of payment of said notes has by agreement between me and the First National Bank of Louisville been extended to August 14, 1954, and said notes bear interest at the rate of 3½% per annum, payable quarterly on the 14th. day of February, May, August, and November. Your company shall assume payment of the interest on said notes from November 1, 1953.

(b) My indebtedness of $200,000.00 to each of the following banks: The Louisville Trust Company, of Louisville, Kentucky; Security Trust Company, of Lexington, Kentucky; and First National Bank and Trust Company of Lexington, Lexington, Kentucky, the payment of which is secured by a mortgage and a supplemental mortgage executed and delivered by me and my wife to said banks under date of October 30, 1953, which said mortgages cover all of the property used in printing and publishing said newspapers and other real estate owned by me. You shall assume the interest on said loans from November 1, 1953.

2. Your company shall fulfill all of the outstanding contracts for the purchase of paper and other materials and any and all employment contracts, including the employment contract of Fred B. Wachs as General Manager of said newspapers, and shall otherwise fulfill the commitments incurred through October 31, 1953, in the regular course of business of the publication of said newspapers.

3. Your company shall issue and deliver to me, fully paid and nonassessable, all of the authorized capital stock of your company, to-wit: 1,000 shares of Common Stock, with no par value.

4. I will execute and deliver to your company a lease for a term of five years covering the real estate now used and occupied by said business on West Short Street in Lexington, Kentucky, for a term of five years at an annual net rental of $28,800.00, payable in monthly instalments of $2400.00 each and with three five-year options to renew the lease upon the same terms and conditions and at the same rental.

The aforesaid indebtedness to First National Bank of Louisville in the sum of $415,000.00 is secured by certain policies of insurance upon my life in the aggregate face amount of $721,000.00 and with a cash surrender value in excess of the amount of the loan. I agree, as an additional consideration to your company for this transaction, to use my best efforts to extend the payment of said notes from time to time until the same is paid and to continue to make available as security therefor all of said policies upon my life to the extent that the same may be necessary to procure an extension of said loan. In the event said loan should not be extended, I agree to exercise my right to borrow on the policies from the respective insurance companies in an amount of the then balance of the loan or to pledge said policies as you may request so as to obtain a loan from others not to exceed $415.000.00.

Upon your acceptance of this offer, I will execute and deliver to you an instrument transferring all of the assets of said newspapers (except the real estate) subject to the existing liabilities as at October 31, 1953, and subject further to your agreement to assume and pay my obligations as above set out.

On October 31, 1953, the board of directors of the corporation unanimously adopted the following resolution:

BE IT RESOLVED that the written offer of October 31, 1953, of Mr. John G. Stoll to the Board of Directors of this Company be and the same is hereby accepted, and, in accordance therewith, that this corporation accept a conveyance of all of the assets of The Lexington Herald, The Lexington Leader, and The Sunday Herald-Leader (excepting the real estate) at the book value thereof set forth in the audit of October 31, 1953, prepared by Burlingame & Co., Certified Public Accountants, Chicago, Illinois, and assume, for and on behalf of the Company, all of the liabilities thereof as set forth in said audit, and that in addition thereto the corporation shall assume the following additional liabilities of John G. Stoll individually, together with interest thereon from November 1, 1953:

(a) Indebtedness to First National Bank of Louisville, of Louisville, Kentucky, in the aggregate principal amount of $415,000.00, evidenced by the following notes:

| | |
|---|---|
| $295,000.00 | dated August 14, 1939 |
| 35,000.00 | dated February 28, 1941 |
| 11,000.00 | dated April 17, 1942 |
| 74,000.00 | dated April 3, 1946 |

The time of payment of said notes has by agreement between Mr. Stoll and the First National Bank of Louisville been extended to August 14, 1954, and said notes bear interest at the rate of $3\frac{1}{2}\%$ per annum, payable quarterly on the 14th day of February, May, August and November;

(b) Indebtedness of $200,000.00 to each of the following banks: The Louisville Trust Company, of Louisville, Kentucky; Security Trust Company, of Lexington, Kentucky; and First National Bank and Trust Company of Lexington, Lexington, Kentucky, the payment of which is secured by a mortgage and a supplemental mortgage executed and delivered by John G. Stoll and wife to said banks under date of October 31, 1953, which said mortgages cover all of the property used in printing and publishing said newspapers and other real estate owned by him;

And that upon the execution and delivery of an instrument conveying all of the assets of said newspaper enterprises to this corporation, subject to the liabilities as aforesaid, then the President and Secretary, on behalf of the corporation, shall issue to John G. Stoll or his nominee all of the capital stock of the corporation consisting of 1,000 shares of Common Stock without par value, fully paid and nonassessable, at a stated value of $100.00 per share.

On October 31, 1953, Stoll transferred to the corporation by an indenture and agreement all of the operating assets of his proprietary newspaper business and the corporation issued and delivered to him all of its authorized capital stock, consisting of 1,000 shares, and agreed to pay Stoll's liabilities as of that date in the aggregate amount of $1,015,000. The adjusted cost basis of the net operating assets of the decedent's proprietary newspaper business transferred by him to the corporation amounted to $663,879.95, computed as follows:

| | |
|---|---|
| Cash _____ | $3, 677. 01 |
| Accounts receivable, advertising_____ | 191, 312. 72 |
| Accounts receivable, employees, etc_____ | 1, 868. 87 |
| Inventories _____ | 59, 894. 10 |
| Other current assets_____ | 2, 369. 22 |
| Depreciable assets, net after depreciation_____ | 129, 883. 57 |
| Deferred charges, etc_____ | 6, 450. 80 |
| Associated Press franchise, at cost_____ | 20, 000. 00 |
| Goodwill at cost_____ | 374, 175. 25 |
| Due bills receivable_____ | 420. 00 |

|  | | |
|---|---|---|
| | | $790, 051. 54 |
| Less recorded liabilities: | | |
| Accounts payable_____ | 57, 838. 43 | |
| Accrued expenses_____ | 25, 553. 75 | |
| Prepaid subscriptions_____ | 42, 779. 41 | 126, 171. 59 |

| | |
|---|---|
| Net assets transferred_____ | 663, 879. 95 |

The opening journal entry, as adjusted, on the books of the corporations as of October 31, 1953, is as follows:

| | | |
|---|---|---|
| Cash _____ | $3, 677. 01 | |
| Accounts receivable, advertising_____ | 191, 312. 72 | |
| Due bills receivable_____ | 420. 00 | |
| Accounts receivable, employees, etc_____ | 1, 868. 87 | |
| Inventories _____ | 59, 894. 10 | |
| Other current assets_____ | 2, 369. 22 | |
| Depreciable assets, net_____ | 129, 883. 57 | |
| Deferred charges, etc_____ | 6, 450. 80 | |
| Associated Press franchise_____ | 20, 000. 00 | |
| Goodwill _____ | 825, 295. 30 | |
| Accounts payable_____ | | $57, 838. 43 |
| Accrued expenses _____ | | 25, 553. 75 |
| Prepaid subscriptions_____ | | 42, 779. 41 |
| Long-term liabilities_____ | | 1, 015, 000. 00 |
| Capital stock_____ | | 100, 000. 00 |

On November 7, 1953, Mohney sent a letter to the Louisville Trust Company, the Security Trust Company, and the First National Bank and Trust Co., of Lexington, which reads in pertinent part as follows:

Gentlemen:

On October 30, 1953, John G. Stoll and Virginia Duncan Stoll, his wife, executed and delivered to you jointly a mortgage covering certain property of The Lexington Herald and The Lexington Leader which he at that time operated as a sole proprietorship. This mortgage secured loans of $200,000 made to Mr. Stoll by each of you. On the same day he and Mrs. Stoll executed a supplemental mortgage as additional security which covered other real estate.

On October 31, Mr. Stoll conveyed to Lexington Herald-Leader Co., a Kentucky corporation which he had recently organized, all of the assets used in printing and publishing said newspapers, with the exception of the real estate which he retained and leased to the corporation. The corporation assumed all of the liabilities of the papers as disclosed by audit made October 31, and in

addition thereto assumed payment of the mortgage indebtedness of $600,000 to your banks.

In connection with your loan to Mr. Stoll, assumed by the new corporation, please find enclosed the following documents:

1. Opinion on title dated November 6 covering the property included in the original mortgage.

2. Opinion on title covering the property included in the supplemental mortgage.

3. Copies of mortgage and supplemental mortgage.

4. Letter dated November 2, 1953, addressed to your three banks signed by Lexington Herald-Leader Co. and by John G. Stoll with reference to limitations of salaries and dividends and provisions for working capital.

5. Written offer by John G. Stoll addressed to the Board of Directors of the new company, together with indenture and agreement between Stoll and the new company under which the new company assumed payment of your mortgage indebtedness. In addition thereto, Lexington Herald-Leader Co., by an endorsement on each of your three notes, guaranteed payment thereof.

In addition to the foregoing, copies of the three notes, all of which are identical, are attached.

The First National Bank of Louisville received a similar notification with respect to Stoll's liability to it in the principal amount of $415,000.

Shortly after September 30, 1954, Burlingame & Company mailed duplicate standard bank confirmation forms to each of the First National Bank of Louisville, the Louisville Trust Company, the Security Trust Company, and the First National Bank and Trust Co., of Lexington, asking for a report to be made on one of the duplicate copies of the form, with respect to the status of the account of Lexington Herald-Leader Co. with the bank.

On the form executed by the First National Bank of Louisville, it was reported the Lexington Herald-Leader Co. was directly liable to it at the close of business on September 30, 1954, in the amount of $195,000, balance on a note (or notes), signed by John G. Stoll, "Indebtedness assumed by Lexington Herald-Leader Co. 10/31/53."

Likewise, the Louisville Trust Company reported to Burlingame & Company that as of September 30, 1954, Lexington Herald-Leader Co. was directly liable to it in the amount of $180,000 on an indebtedness of John G. Stoll "assumed by Lexington Herald-Leader Co. under agreement dated 10/31/53."

Likewise, Security Trust Company reported to Burlingame & Company that Lexington Herald-Leader Co. was directly liable to it as of September 30, 1954, in the amount of $175,000 as the balance on a loan of October 30, 1953.

Likewise, First National Bank and Trust Co., of Lexington, reported to Burlingame & Company that Lexington Herald-Leader Co. was directly liable to it in the amount of $175,000 as of September 30, 1954, as the balance of a loan of October 30, 1953, evidenced by

the original note of John G. Stoll in the amount of $200,000 "assumed by Lex. Herald-Leader 10/31/53."

The procedure that Burlingame & Company followed with respect to September 30, 1954, was followed in subsequent years. The information received from the banks as to the liability of Lexington Herald-Leader Co. to the banks was the same as that indicated above except for differences in the amounts of the liabilities.

Until Stoll's death, the board of directors of the corporation was composed of Stoll, Wachs, and Mohney. Also, until his death, Stoll was president and treasurer of the corporation, and Wachs was vice president and secretary. After Stoll's death, the board of directors of the corporation was composed of Wachs, Mohney, and Dabney. Wachs became the president and treasurer of the corporation, Dabney the vice president, and Mohney the secretary.

Each of the $200,000 notes given by Stoll to the First National Bank and Trust Co., the Security Trust Company, and the Louisville Trust Company bears the following endorsement:

For Value Received, the undersigned hereby assumes and guarantees payment of the within note, this 31st. day of October, 1953.

LEXINGTON HERALD-LEADER Co.

By (s) John G. Stoll
*President*

ATTEST:
  (s) Fred B. Wachs
    *Secretary*

The note ledger of the First National Bank of Louisville for Stoll's liability to it in the amount of $415,000 bears the notation "Assumed by Lexington Herald-Leader Co. (Ky Corp) Lexington, Ky as of 10–31–53."

During the calendar years 1953 through 1956 payments on principal and interest were made by the corporation on the above-noted liabilities as follows:

| Year | Principal payment | Interest payment |
|---|---|---|
| 1953 | $36,000 | $49.19 |
| 1954 | 279,000 | 38,032.55 |
| 1955 | 55,000 | 21,190.28 |
| 1956 | 115,000 | 28,322.22 |

During its taxable years ending September 30, 1954, through September 30, 1959, payments on principal and interest were made by the corporation on the above-noted liabilities aggregating $1,015,000 as follows:

| Fiscal year ended Sept. 30— | Principal | Interest |
|---|---|---|
| 1954 | $290,000 | $35,262.58 |
| 1955 | 60,000 | 32,233.63 |
| 1956 | 95,000 | 28,694.42 |
| 1957 | 145,000 | 22,669.15 |
| 1958 | 240,000 | 13,354.72 |
| 1959 | 185,000 | 3,385.12 |
| Total | 1,015,000 | 135,599.62 |

During its taxable years ending September 30, 1954, through September 30, 1959, the corporation paid dividends in amounts as follows:

| Fiscal year ended Sept. 30— | Amount of dividends |
|---|---|
| 1954 | $10,000 |
| 1955 | 10,000 |
| 1956 | 88,500 |
| 1957 | 47,500 |
| 1958 | 80,000 |
| 1959 | 135,000 |

The corporation had net income for its taxable year ending September 30, 1954, and taxable income for its taxable years ending September 30, 1955, and September 30, 1956, as follows:

| Taxable year ended Sept. 30— | Net or taxable income [1] |
|---|---|
| 1954 | $554,969.10 |
| 1955 | 633,023.33 |
| 1956 | 612,515.33 |

[1] Without taking into account the supplemental stipulation of facts which settled certain issues.

As of the date of Stoll's death on August 26, 1959, the total issued and outstanding capital stock of the corporation consisted of 1,000 shares, of which he owned 980 shares. The remaining 20 shares were the subject of a gift which he made on December 1, 1953, to the Security Trust Company as trustee of a trust for the benefit of his children. The trust agreement provided that none of the capital stock of the Lexington Herald-Leader Co. held in the trust estate should be sold except in connection with the sale of all such stock which the Security Trust Company might hold as a part of John G. Stoll's estate as executor under his last will and testament.

On December 8, 1953, the decedent executed his last will and testament which, together with codicils executed by him subsequent thereto, was admitted to probate in the Fayette County Court on September 3, 1959. Under the terms of his last will and testament, John devised and bequeathed one-fourth of the capital stock of the Lexington Herald-Leader Co. owned by him at his death to the Security Trust Company, as trustee, for the use and benefit of his wife for her life, with power in his wife to appoint the same by her last will and testament. The remainder of the stock was devised and bequeathed,

as a part of his residuary estate, to the Security Trust Company, as trustee, for the use and benefit of his wife, to the extent stated therein, and thereafter for the use and benefit of his children and their issue until the termination of the trust. The Security Trust Company was named and appointed executor of the will and trustee of the trusts created thereby.

## OPINION.

John G. Stoll was the owner of two Lexington, Kentucky, newspapers. Pursuant to his desire to secure their continued publication and the profits therefrom for his heirs beyond his death, he caused a corporation to be formed; contributed the assets of the newspapers; took back all of the corporation's stock; and had the corporation assume his liabilities in the amount of $1,015,000. Petitioners contend that the placing of the newspapers in a corporate form with corporate assumption of the personal indebtedness of Stoll constituted a nontaxable transaction by reason of sections 112(b)(5) and 112(k), I.R.C. 1939.[2] Respondent argues that the transaction, which resulted in assumption of Stoll's liabilities in the amount of $1,015,000, was taxable. He asserts that John Stoll's principal purpose was tax avoidance; that, in any event, there was no valid business purpose for

---

[2] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(b) EXCHANGES SOLELY IN KIND.—

\* \* \* \* \* \* \*

(5) TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation ; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange. Where the transferee assumes a liability of a transferor, or where the property of a transferor is transferred subject to a liability, then for the purpose only of determining whether the amount of stock or securities received by each of the transferors is in the proportion required by this paragraph, the amount of such liability (if under subsection (k) it is not to be considered as "other property or money") shall be considered as stock or securities received by such transferor.

\* \* \* \* \* \* \*

(k) ASSUMPTION OF LIABILITY NOT RECOGNIZED.—Where upon an exchange the taxpayer receives as part of the consideration property which would be permitted by subsection (b)(4), (5), or (10) of this section to be received without the recognition of gain if it were the sole consideration, and as part of the consideration another party to the exchange assumes a liability of the taxpayer or acquires from the taxpayer property subject to a liability, such assumption or acquisition shall not be considered as "other property or money" received by the taxpayer within the meaning of subsection (c), (d), or (e) of this section and shall not prevent the exchange from being within the provisions of subsection (b)(4), (5), or (10) ; except that if, taking into consideration the nature of the liability and the circumstances in the light of which the arrangement for the assumption or acquisition was made, it appears that the principal purpose of the taxpayer with respect to the assumption or acquisition was a purpose to avoid Federal income tax on the exchange, or, if not such purpose, was not a bona fide business purpose, such assumption or acquisition (in the amount of the liability) shall, for the purposes of this section, be considered as money received by the taxpayer upon the exchange. In any suit or proceeding where the burden is on the taxpayer to prove that such assumption or acquisition is not to be considered as money received by the taxpayer, such burden shall not be considered as sustained unless the taxpayer sustains such burden by the clear preponderance of the evidence.

the transaction as cast. In the alternative, respondent claims that the entire transaction was a sham and that there was no valid assumption of the liabilities by the corporation.

Respondent has argued further that, even if Stoll's principal purpose was not tax avoidance and there was a valid business purpose, gain was recognized to the extent the liabilities assumed were in excess of the basis of the properties transferred to the corporation, citing *Jack L. Easson*, 33 T.C. 963 (1960). In connection with the latter contention, it may be appropriate at this point to note that, subsequent to the trial in the instant case, the decision of the Tax Court in the *Easson* case was modified. *Easson* v. *Commissioner*, 294 F. 2d 653 (C.A. 9, 1961). In that case the Tax Court had found as a fact that tax avoidance was not the principal motive of the taxpayer and that there was a valid business purpose for the assumption by the corporation there involved of a mortgage in excess of the basis of the property transferred to it. It was further concluded, however, that the property transferred could not have a negative basis and that gain was realized to the extent the mortgage assumed exceeded the adjusted basis of the property transferred. The Court of Appeals held, however, that sections 112(b)(5) and 112(k) were not ambiguous, that no specific provisions of the Code precluded a negative basis in a section 112(b)(5) transaction, and that the literal application of the language of that section did not result in an "absurd" result. It accordingly held that no gain was realized in the transaction involved. For reasons which will hereinafter appear, we do not reach the question of a *negative* basis in the instant case, and do not consider it necessary to reconsider the position we took in the *Easson* case regarding a negative basis in a section 112(b)(5) transaction.

Section 112(b)(5) provides that no gain or loss is to be recognized when property is transferred to a corporation solely in exchange for stock or securities in such corporation and immediately after the exchange the transferor is in control of the corporation. Here, John Stoll received all of the stock of the Lexington Herald-Leader Co., and was clearly in control of the corporation after the transfer to it of the newspaper business. To this extent the requirements of section 112(b)(5) appear to have been met.

Section 112(c)(1) [3] provides, however, that gain shall be recognized to the extent that "other property or money" is received in the ex-

---

[3] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(c) GAIN FROM EXCHANGES NOT SOLELY IN KIND.—

(1) If an exchange would be within the provisions of subsection (b)(1), (2), (3), or (5), or within the provisions of subsection (1), of this section if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph or by subsection (1) to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

change. The question is therefore presented whether the assumption of Stoll's liabilities in the amount of $1,015,000, or any portion thereof, constitutes the receipt of "other property" by Stoll, thereby making the transaction taxable. The answer to this question depends upon the application of section 112(k).

Section 112(k) provides in relevant part that the assumption of liabilities—

shall not be considered as "other property or money" received by the taxpayer within the meaning of subsection (c) * * * and shall not prevent the exchange from being within the provisions of subsection (b)(4), (5), * * *; except that if, taking into consideration the nature of the liability and the circumstances in the light of which the arrangement for the assumption or acquisition was made, it appears that the principal purpose of the taxpayer with respect to the assumption or acquisition was a purpose to avoid Federal income tax on the exchange, or, if not such purpose, was not a bona fide business purpose, such assumption or acquisition (in the amount of the liability) shall, for the purposes of this section, be considered as money received by the taxpayer upon the exchange.

We have set out in detail the matters considered by John Stoll and his advisers prior to the formation of the corporation. These facts demonstrate that Stoll's principal purpose in creating the corporation was to preserve intact the ownership of his newspapers and to provide a practical means of operation of those papers for the benefit of his heirs and employees. We consider first whether the assumption of the liabilities by the corporation had as its principal purpose the *avoidance* of Federal income tax on the exchange.

The witnesses were unanimous in stating that tax considerations played little or no role in Stoll's decision to form the corporation and have it assume his indebtedness. In fact, Stoll's accountant testified he informed Stoll the plan should be adopted even if it appeared tax consequences would be adverse. One of the primary purposes of incorporation was avoidance of the relative certainty that Stoll's indebtedness, coupled with Federal estate and Kentucky inheritance taxes, would force sale of the newspapers if they remained in individual proprietorship. In short, incorporation and provisions for the payment of Stoll's liabilities out of the profits of the business were deemed necessary to the continued operation of the newspaper business, Stoll's other assets being insufficient to have satisfied all his liabilities at that time.

On October 30, 1953, John Stoll was indebted to the First National Bank of Louisville in the principal amount of $415,000. He owed the First National Bank and Trust Co., of Lexington, $76,080.56 and the Security Trust Company, of Lexington, $50,694.44 in principal and interest. He was obligated to the extent of $189,112.50 in principal and interest on the so-called Lexington Herald-Leader bonds. In addition, he had estimated 1953 Federal and Kentucky tax liabilities in the

amounts of $310,000 and $5,000, respectively. The amounts due on Herald-Leader bonds represented the remaining indebtedness on a 1944 $600,000 bond issue, which refinanced a $500,000 bond issue of which Stoll availed himself in 1937 in connection with the purchase in that year of the Lexington Herald.

At the end of October 1953, Stoll obtained a new loan of $600,000, participated in to the extent of $200,000 each by the First National Bank and Trust Co., of Lexington, the Security Trust Company, of Lexington, and the Louisville Trust Company. These funds, together with $30,751.21 of Stoll's other funds, were used to discharge the above-enumerated liabilities and estimated taxes with the exception of the $415,000 owed to the First National Bank of Louisville, on which note the interest was current and with respect to which Stoll was advised that no immediate pressure for collection would be placed on the corporation when the note was assumed.

Thus, it appears that removal of the possible pressure of collection motivated the refinancing and corporate assumption. These were essential to the continued existence of the newspapers in the Stoll family should he die. The fact that the purposes for which the indebtedness, other than the bonds and tax liabilities, was incurred originally are not clarified by the record and that the indebtedness did not appear on the proprietorship books of account do not, therefore, jeopardize petitioners' contention that assumption of the liabilities was not prinicpally for the purpose of avoiding taxation. In fact, to find a principal purpose of tax avoidance for the assumption of the liabilities here involved we would have to find either that John Stoll had a principal purpose wholly unknown to his most intimate advisers or that the witnesses in this case misrepresented the facts. We decline to follow such an approach, especially in view of the fact that Stoll actually implemented the plans recommended to him. Petitioners have demonstrated by a clear preponderance of the evidence that the principal purpose of corporate assumption of the indebtedness was not tax avoidance. We are convinced this is true with respect to the $600,000 in liabilities owed to the First National Bank and Trust Co., of Lexington, the Security Trust Company of Lexington, and the Louisville Trust Company, which were assumed by the corporation. We are also satisfied that John had no tax avoidance motive with respect to the $415,000 owed to the First National Bank of Louisville, the liability for which was assumed by the corporation.

We next consider the requirement contained in section 112(k) that there be a *bona fide business purpose* for the assumption of liabilities by a corporation to constitute a nontaxable exchange. We are satisfied from the evidence presented and discussed above that there was a bona fide business purpose for the assumption by the corporation of the $600,000 in liabilities which Stoll owed to the First National Bank

and Trust Co., of Lexington, the Security Trust Company of Lexington, and the Louisville Trust Company. These liabilities followed the assets transferred to the corporation at the insistence or subsumed insistence of the creditors. Payment of such liabilities would necessarily have to be made out of the profits of the business, or, if it was not successful, out of such assets since Stoll's other assets were not sufficient to satisfy them. It is to be noted limitations were placed on the payment of salary to Stoll, and also upon the payment of dividends until all debt requirements were met.

It is clearly evident that business motives dictated the formation of the corporation. This was no empty device, but rather an essential of Stoll's plans for both his estate and the continuation of the newspaper business. No purpose is more germane to business than its profitable perpetuation—the specific purpose accomplished here. The bank to be named executor of Stoll's estate reminded him of the practical difficulties and liabilities of business management in an unincorporated state. Moreover, there existed the possibility that control would be evenly divided if Stoll's surviving widow renounced his will and took her statutory share under Kentucky law. She would have been entitled to one-half Stoll's personal property of which the newspapers constituted a major portion. Thus, one-half control would have vested in Virginia, the other one-half in the bank as trustee for the other heirs. This could have resulted in a stalemate and have seriously affected the successful operation of the business.

We think, however, that a different conclusion is required with respect to the $415,000 loan by the First National Bank of Louisville which was assumed by the corporation. Taking into consideration the nature of the liability and the circumstances in the light of which the arrangement for the assumption of the $415,000 indebtedness owed by Stoll to the First National Bank of Louisville was made, petitioners have not shown by a clear preponderance of the evidence that the assumption of this amount of indebtedness by the corporation was for a bona fide business purpose.

The amount here in question was obtained by Stoll on four demand notes executed by him to the First National Bank of Louisville as follows: $295,000 on August 14, 1939; $35,000 on February 28, 1941; $11,000 on April 17, 1942; and $74,000 on April 3, 1946. All of said indebtedness was secured by an assignment of certain life insurance policies maintained by Stoll on his life, the cash surrender value of which was equal to or in excess of the amount of such loans. The evidence indicates that the $295,000 loan obtained in 1939 was used to pay off other loans which Stoll had made against his life insurance policies. There is no evidence for what original purpose any of said loans, including the three later loans from the bank, were obtained or used. In any event there is no evidence that any of said loans had

any connection with Stoll's newspaper business. Moreover, when the refinancing of his other liabilities by new loans participated in by three banks to be secured by the assets of the newspaper business and certain real estate including the real estate on which the newspaper business was being conducted, was being considered, Stoll's financial advisers, including the executive vice president of the First National Bank of Louisville, and the president of the Security Trust Company of Lexington, advised him it would not be necessary to disturb the indebtedness which he owed the First National Bank of Louisville. Inasmuch as this indebtedness had no relevancy to the business of the corporation, was amply secured by the cash surrender value of the life insurance policies, and the lender was willing to allow sufficient time for it to be retired, we think it clear that the inclusion of the $415,000 indebtedness in the liabilities assumed by the corporation served no business purpose. Even if the lender had demanded immediate payment and it had been necessary to surrender the life insurance policies to satisfy the indebtedness, there is nothing in the record to indicate that this would have had any effect upon the business of the corporation. If anything, the assumption of this indebtedness was adverse to the business interests of the corporation since it was required to and did pay off an indebtedness having no relation to its organization or in the conduct of its business. Although the liability for such indebtedness was assumed by the corporation, the insurance policies assigned to the bank as security for the loans were not included in the assets transferred to the corporation.

Having determined that there was no bona fide business purpose for the assumption by the corporation of Stoll's liability to the First National Bank of Louisville in the amount of $415,000, we are next faced with the question as to whether by reason of the assumption of such particular liability, the total amount of the liabilities assumed ($1,015,000) is to be considered as "other property or money" received so as to render the entire amount ($1,015,000) taxable. So far as we are aware, this problem has never been passed upon by any court. Nor has it been discussed on brief by either of the parties.

There is nothing in the statute or the regulations or congressional reports relating to section 112(k) of the 1939 Code which, in our opinion, requires such a holding. Section 112(k) provides that if the principal purpose of the taxpayers with respect to the assumption "was a purpose to avoid Federal income tax on the exchange, or, if not such purpose, was not a bona fide business purpose, such assumption or acquisition (*in the amount of the liability*) shall, for the purposes of this section, be considered as money received by the taxpayer upon the exchange." (Emphasis supplied.) In our opinion the language "in the amount of the liability" has reference to *the liability* as to which there was a purpose of tax avoidance or as to which there was not a

bona fide business purpose, and does not necessarily include other liabilities as to which there was no purpose of tax avoidance and there was a bona fide business purpose. To hold otherwise would be tantamount to imposing a penalty without a clear statutory mandate therefor. This the law does not favor. *Gould* v. *Gould*, 245 U.S. 151; *Mead Corporation* v. *Commissioner*, 116 F. 2d 187; *Uhl Estate Co.* v. *Commissioner*, 116 F. 2d 403. Both this Court and the Court of Appeals, in the *Easson* case, recognized that the purpose of section 112(b)(5) is not to *exempt* gain from taxation but merely to *defer* or *postpone* the taxable event to a later time. Thus, strict construction against the taxpayer, as in the case of statutory provisions granting tax exemptions, is not required.

We hold that the assumption by the corporation of the $600,000 indebtedness which Stoll owed to the First National Bank and Trust Co., of Lexington, the Security Trust Company of Lexington, and the Louisville Trust Company, is not to be considered as "other property or money" received by Stoll within the meaning of section 112(c) and (k) and that such assumption does not prevent the exchange from being within the provision of section 112(b)(5). We further hold, however, that the assumption by the corporation of the $415,000 indebtedness which Stoll owed to the First National Bank of Louisville is to be considered as "money received" by Stoll upon the exchange, within the meaning of section 112(c) and (k), and as such is to be considered in computing the gain to be recognized upon the exchange of Stoll's newspaper business to the corporation.

In arriving at our conclusions, we have not been unaware of the provisions of section 357(a) and (b) of the Internal Revenue Code of 1954, which correspond to section 112(k) of the 1939 Code, and of the comment contained in the congressional reports relating thereto. Instead of the phrase "(in the amount of the liability)" employed in section 112(k) of the 1939 Code, section 357(b)(1) of the 1954 Code contains the phrase "(In the *total* amount of the liability assumed or acquired pursuant to such exchange)." (Emphasis supplied.) In commenting on this section, S. Rept. No. 1622, 83d Cong., 2d Sess. (1954), at page 270, states:

The language of subsection (b), relating to assumption of liability for tax avoidance purpose has been changed in one respect from existing law. Where such a tax avoidance purpose exists, the total amount of the liabilities assumed will be considered as money received by the taxpayer and not merely a particular liability with respect to which the tax avoidance purpose existed. This change is intended merely to clarify existing law.

The legislative history of a statute is extremely important in its interpretation, particularly if there is an ambiguity in its language. The relevant legislative history is ordinarily, however, that of the statute under consideration, not of a subsequent statute. *Penn Mutual*

*Co.* v. *Lederer*, 252 U.S. 523; Seidman, "Legislative History in Federal Income Tax Cases," 18 Taxes 339; 1 Mertens, Law of Federal Income Taxation, sec. 3.26. Although congressional comments relating to prior Acts are to be considered, they are not necessarily controlling. *Fisher Flouring Mills Company* v. *United States*, 270 F. 2d 27 (C.A. 9, 1958); *American Exchange Securities Corp.* v. *Helvering*, 74 F. 2d 213 (C.A. 2, 1934); *Fire Companies Bldg. Corp.* v. *Commissioner*, 54 F. 2d 488 (C.A. 2, 1931), certiorari denied 286 U.S. 546; *Rodner* v. *United States*, 149 F. Supp. 233 (S.D. N.Y. 1957). In *United States* v. *Price*, 361 U.S. 304, 313 (1960), the Supreme Court stated, "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." In *Jorgensen* v. *United States*, 152 F. Supp. 73, 76 (1957), the Court of Claims stated it did not place "great reliance" upon "a statement by a later Congress as to what was intended by a statute enacted by an earlier one. Frequently the intention of the later Congress may be to make clear what was doubtful in the earlier statute."

Even if we were to conclude that the statement in the Senate report relating to section 357(b) of the 1954 Code correctly reflected the intention of the prior Congress in the enactment of section 112(k) of the 1939 Code, such a conclusion would not be dispositive of the question presently being considered.

As the report indicates, Congress was concerned with the effect of a *tax avoidance* purpose upon the total amount of the liabilities assumed. The lack of a bona fide business purpose was not mentioned. Without clear statutory mandate or expression of legislative intent we are unwilling to conclude, on the facts herein presented, that the lack of a bona fide business purpose with respect to the assumption of the $415,000 liability should result in the loss of the nonrecognition benefits provided by section 112(b)(5) with respect to the $600,000 liabilities as to which there was no purpose of tax avoidance and there was a bona fide business purpose.

We find no merit in respondent's alternative argument that the entire transaction was a sham and that there was no valid assumption of the liabilities by the corporation. The debts were validly assumed in form and substance.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*