JOHN M. HARRISON AND JANE M. HARRISON, ET AL, [1] Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent Harrison v. Commissioner
Docket Nos. 1518-78, 1519-78, 1520-78.
United States Tax Court
T.C. Memo 1981-211; 1981 Tax Ct. Memo LEXIS 533; 41 T.C.M. (CCH) 1384; T.C.M. (RIA) 81211; April 28, 1981. John *535 T. Suter, for the petitioners. Robyn R. Jones, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined the following deficiencies in the Federal income tax of the petitioners: Petitioner
Taxable Year Ending
Deficiency
John M. & Jane M. Harrison
12/31/73
$ 3,886.05
12/31/74
876.16
John R. & Carolyn Harrison
12/31/73
7,151.84
12/31/74
999.75
Harrison Farms, Ltd.
10/31/74
997.56
1/31/75
3,733.57
The issues are: (1) whether the assumption by petitioner Harrison Farms, Ltd. (HFL) of two $ 10,000 notes owed by petitioner John R. Harrison (John) was for a "bona fide business purpose" within the meaning of section 357(b)(1)(B), Internal Revenue Code of 1954[2]; (2) whether the Harrisons may exclude from their gross incomes, pursuant to section 119, any part of the cost of groceries purchased by HFL for the consumption of themselves and other farm employees; (3) whether HFL may deduct, pursuant to section 162(a), the cost of the groceries referred to in (2) *536 above; (4) whether the Harrisons may exclude from their gross incomes, pursuant to section 119, the cost of utilities and telephone service purchased for their personal residences by HFL; and (5) whether HFL may deduct, pursuant to section 162, the cost of the utilities and telephone service referred to in (4) above. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts together with the exhibits attached thereto are incorporated herein by this reference. At the time their petitioners herein were filed, the Harrisons resided in, and HFL had its principal place of business at, Nickerson, Kansas. HFL was organized by the Harrisons under the laws of the State of Kansas on April 26, 1973, to carry on the business of grain and dairy farming. At the time of incorporation, John M. (Mike) and Jane M. (Jane) Harrison transferred property to HFL in exchange for 524 shares of HFL common stock. Mike and Jane also transferred to HFL in this transaction $ 19,500 in liabilities which HFL assumed. The parties agree that there was a valid business purpose for HFL's assumption of these liabilities and the tax consequences of this assumption are not in issue. *537 In exchange for her transfer of property to HFL at the time of incorporation, Carolyn Harrison (Carolyn) received 35 shares of HFL common stock and 600 shares of HFL preferred stock. In exchange for his transfer of property to HFL at the time of incorporation, John Harrison (John) received 600 shares of HFL common stock and 1,603.44 shares of HFL preferred stock. He also transferred $ 20,000 of his personal liabilities to HFL at this time, which HFL assumed. The $ 20,000 of liabilities arose as described below. On May 30, 1971, Delvin Randolph (Delvin), John's son-in-law, executed a note payable to John Harrison for $ 30,000 (hereinafter the Delvin Randolph note). In exchange for this note, John gave Delvin $ 30,000 in the form of two checks, one dated April 16, 1970, for $ 3,000, and the second dated May 24, 1971, for $ 27,000. In conjunction with the loan to Delvin, John borrowed $ 27,000 from the Central State Bank in Hutchinson, Kansas, on May 24, 1971 (hereinafter the Central State Bank note). On July 20, 1971, John Harrison paid $ 5,000 on the principal of this note. He renewed it for $ 22,000 on November 24, 1971. He made a further principal payment of $ 12,000 *538 on May 16, 1972, leaving a balance of $ 10,000. He renewed the note on this date and again on November 16, 1972. To secure his note to John, Delvin and his wife executed a real estate mortgage to John on March 30, 1973. Delvin purchased the real property subject to the mortgage with the $ 30,000 he borrowed from John on May 30, 1971, for use in his own farming operation. Delvin was not involved in the operation of HFL. He was not a shareholder, officer, or employee of HFL. On May 1, 1973, HFL assumed the remaining balance of $ 10,000 on the Central State Bank note of May 24, 1971. This note represented part of the $ 20,000 of John Harrison's liabilities which HFL assumed at the time it was incorporated. John did not transfer to HFL the Delvin Randolph note of May 30, 1971, or the mortgage securing it.
On February 21, 1973, Delvin borrowed $ 10,000 from John by executing a note payable bearing the same date. As security for this note, Delvin gave John a security interest in forty head of cattle which he purchased with the loan proceeds. In conjunction with the loan to Delvin on February 21, 1973, John borrowed $ 10,000 from the Nickerson State Bank on February 22, 1973. *539 HFL assumed this note on May 1, 1973. The note represented the remainder of the $ 20,000 of John's liabilities which HFL assumed at the time of its incorporation. John did not transfer to HFL the note of February 21, 1973, or the security interest in the forty head of cattle.
John transferred the Central and Nickerson State Bank notes to HFL because he was transferring all of his assets to HFL and accordingly was not sure that he would be capable of repaying these notes, and because he thought they belonged there. He failed to transfer the notes receivable from Delvin to HFL because he forgot. He lent Delvin $ 10,000 in 1973 because the latter was financially overextended and unable to borrow money directly from a bank. After the transfer of property, liabilities, and stock described above, HFL owned 1,131 acres of farm land on which the two separate residences of John and Carolyn Harrison and Mike and Jane Harrison were and are located. At all relevant times, the Harrisons were officers of HFL. On July 31, 1973, the board of directors adopted a resolution stating that HFL is authorized to pay for the meals and lodging of its employees who were also its officers. The resolution *540 states that in return the officer/employees are required to maintain their residences on the farm and to remain on call for the convenience of HFL to handle corporate problems and emergencies. The nature of the operation of HFL during the years in question required constant supervision and availability of personnel on a 24-hour basis to deal with varied and unpredictable farm problems. During the years in question, HFL had 1,000 acres under cultivation, leased 80 acres, and had 131 acres devoted to raising and maintaining 200 head of cattle, of which 70 to 80 were milk cows. The scale of its operations was beyond the capabilities of one man and woman to manage adequately. The Harrisons were all employees of HFL. The men were in charge of the general management of HFL's operation. The women performed farm chores and managed the households. It was part of their duties as corporate employees to purchase groceries, prepare meals, and serve these meals to themselves, their husbands, and the HFL employees who worked on the farm during the summers. During their taxable years 1973 and 1974, the Harrisons received salaries from HFL as follows: Petitioner
Salary Received
1973
1974
John R. Harrison
$ 7,200
$ 17,500
Carolyn Harrison
800
4,000
Mike Harrison
7,200
17,500
Jane Harrison
800
4,000
*541 During 1973 and 1974, John and Mike started work on a typical day at around 5:30 a.m. and were finished by 6:30 p.m. in the winter and somewhat later in the summer. In 1973 and 1974, Carolyn Harrison purchased groceries with John's and her own funds and submitted receipts for the groceries to HFL, which reimbursed them. In 1973 and 1974, Jane Harrison purchased groceries by writing checks on HFL's account. For the year ending January 31, 1974, HFL paid $ 2,428.22 for groceries purchased by the Harrisons. HFL deducted this amount as a business expense on its corporate income tax return. For the year ending January 31, 1975, HFL paid $ 4,219.84 for groceries purchased by the Harrisons. HFL deducted this amount as a business expense on its corporate income tax return. The groceries were prepared into meals by the wives. The meals were consumed both by the Harrisons and by the summer help who, due to the nature of their work, were required to eat some meals at the farm. The meals were all served and consumed on the farm. HFL paid the electric, gas, and telephone bills for the residences of the Harrisons for 1973 beginning May 26, 1973, and for 1974. No allocation of the *542 telepohone cost was made between personal and business use. HFL paid $ 1,060.58 for utilities and telephone service for the year ending January 31, 1974, and $ 1,506.19 for these items for the year ending January 31, 1975.HFL deducted these amounts on its corporate income tax returns for these fiscal taxable years. Mike and Jane Harrison filed joint Federal income tax returns for their taxable years 1973 and 1974 with the Internal Revenue Service Center, Austin, Texas. They did not report as income any of the costs of grocerties, utilities, or telephone service paid for by HFL and consumed by them in 1973 and 1974. John and Carolyn Harrison filed their joint Federal income tax returns for their taxable years 1973 and 1974 with the Internal Revenue Service Center, Austin, Texas. They did not report as income either the $ 20,000 of John Harrison's liabilities assumed by HFL in 1973 or the cost of groceries, utilities, or telephone service paid for by HFL and consumed by them in 1973 and 1974. HFL filed its corporate income tax returns for its fiscal years ending January 31, 1974 and 1975 with the Internal Revenue Service Center, Austin, Texas. It claimed on these returns *543 the deductions for groceries, utilities, and telephone service described above. The Commissioner increased John and Carolyn Harrison's income for their taxable year 1973 by the $ 20,000 amount of John Harrison's liabilities which HFL assumed in 1973 on the theory that such assumption constituted the receipt of "money or other property" in a section 351 exchange pursuant to section 357(a). He further increased the gross incomes of the two Harrison families for 1973 and 1974 by the following amounts of the costs of groceries, utilities, and telephone service paid for by HFL during those years: Amount Gross Income Increased for: Utilities and
Petitioners
Taxable Year
Groceries
Telephone Service
John & Carolyn Harrison
1973
$ 860.23
$ 469.97
1974
1,683.74
735.37
Mike & Jane Harrison
1973
1,320.59
2,463.26
1974
469.97
735.37
The Commissioner determined that these amounts constituted dividends to the Harrisons pursuant to sections 301 and 316. The Commissioner disallowed the deductions taken by HFL for groceries, utilities, and telephone service described above on the theory that they did not constitute ordinary and necessary *544 business expenses within the meaning of section 162(a). OPINION Issue 1. HFL's Assumption of John Harrison's Liabilities
Section 351 provides: SEC. 351. TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR. (a) GENERAL RULE.--No gain or loss shall be recognized if property is transferred to a corporation * * * by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. (b) RECEIPT OF PROPERTY.--If subsection (a) would apply to an exchange but for the fact that there is received, in addition to the stock or securities permitted to be received under subsection (a), other property or money, then-- (1) gain (if any) to such recipient shall be recognized, but not in excess of-- (A) the amount of money received, plus (B) the fair market value of such other property received; and (2) no loss to such recipient shall be recognized. Section 357 provides: SEC. 357. ASSUMPTION OF LIABILITY. (a) GENERAL RULE.--Except as provided in subsections (b) and (c), if-- (1) the taxpayer receives property which would be permitted *545 to be received under section 351 * * * without the recognition of gain if it were the sole consideration, and (2) as part of the consideration, another party to the exchange assumes a liability of the taxpayer, or acquires from the taxpayer property subject to a liability, then such assumption or acquisition shall not be treated as money or other property, and shall not prevent the exchange from being within the provisions of section 351 * * *. (b) TAX AVOIDANCE PURPOSE.-- (1) IN GENERAL.--If, taking into consideration the nature of the liability and the circumstances in the light of which the arrangement for the assumption or acquisition was made, it appears that the principal purpose of the taxpayer with respect to the assumption or acquisition described in subsection (a)-- (A) was a purpose to avoid Federal income tax on the exchange, or (B) if not such purpose, was not a bona fide business purpose, then such assumption or acquisition (in the total amount of the liability assumed or acquired pursuant to such exchange) shall, for purposes of section 351 * * * be considered as money received by the taxpayer on the exchange. (2) BURDEN OF PROOF.--In any suit or proceeding *546 where the burden is on the taxpayer to prove such assumption or acquisition is not to be treated as money received by the taxpayer, such burden shall not be considered as sustained unless the taxpayer sustains such burden by the clear preponderance of the evidence. To prevail on this issue, John has the burden to show by a clear preponderance of the evidece that HFL's assumption of the Central State Bank and Nickerson State Bank notes was for a bona fide business purpose. [3]
We have previously had occasion to consider the requirements of section 357(b)(1)(B). In Simpson v. Commissioner, 43 T.C. 900 (1965), the taxpayer transferred securities which he had pledged as collateral for certain of his liabilities to his controlled corporation. In return, the corporation issued him stock and assumed the liabilities to which the securities were subject. 43 T.C. at 908. We reviewed the legislative history of sections 351 and 357 and concluded that these provisions-- appear to be directed to the transaction in which property is exchanged for stock * * *. They are not concerned *547 with the tax effects of activities of the transferor-stockholder prior to engaging in the transaction, nor with those of the transferee-corporation after the transaction is completed, except to the extent they might shed some light on the purpose of the taxpayer in entering into the transaction. [43 T.C. at 915-916.] See Easson v. Commissioner, 294 F.2d 653, 659 (9th Cir. 1961); Campbell v. Wheeler, 342 F.2d 837, 840 n. 11 (5th Cir. 1965). We held that the petitioner had sustained his burden of proving that the corporation's assumption of the liabilities was for a bona fide business purpose. We found as a fact that the petitioner believed that it was vitally important for a dry goods business to own marketable securities because the business would be able to obtain financing more easily, income from the securities would enable the business to weather hard times, and the business would have adequate working capital for expansion and other purposes. He thus had a valid business reason to transfer the securities to the corporation. There was accordingly a valid business reason to transfer the liabilities to the corporation because *548 petitioner-- relied in part on the income from these securities to pay the liabilities and it would seriously impair his own position to transfer these * * * securities to the corporation without having it assume the liabilities. [43 T.C. at 919.] We also considered the corporation's situation and found that "there was a bona fide business purpose for it to assume the liabilities" because it was receiving high-yield securities with a market value substantially in excess of the liabilities. The dividend income was higher than the interest payments, and the excess value would provide working capital. 43 T.C. at 918-920. Stoll v. Commissioner, 38 T.C. 223 (1962), involved a taxpayer who incorporated his sole proprietorship newspaper business. As of October 30, 1953, taxpayer owed $ 415,000 to Bank I. This debt was secured by taxpayer's assignment of certain policies of insurance on his life to Bank I. He had other liabilities (including estimated unpaid income tax liabilities) of approximately $ 631,000.On this date, he consolidated these latter into three $ 200,000 long-term loans from Banks II, III, and IV, securing the loans *549 by mortgaging the assets of the sole proprietorship. The next day, he transferred these assets to the corporation in exchange for stock. The corporation assumed the $ 415,000 liability to Bank I secured by the insurance policies and the $ 600,000 liability to the other banks secured by the business assets. 38 T.C. at 230-235. We found as a fact that taxpayer's principal purpose in creating the corporation was to preserve intact the ownership of his newspaper business and provide a practical means for its operation by his heirs and empoloyees. Due to the amount and structure of his liabilities, the taxpayer found incorporation and provision for the payment of liabilities out of corporate earnings necessary to the continued existence of his business. 38 T.C. at 242. We concluded that there was a bona fide business purpose for the corporation's assumption of the loans totaling $ 600,000 because: These liabilities followed the assets transferred to the corporation at the insistence or subsumed insistence of the creditors. Payment of such liabilities would necessarily have to be made out of the profits of the business, or, if it was not successful, out *550 of such assets since Stoll's other assets were not sufficient to satisfy them. It is to be noted limitations were placed on the payment of salary to Stoll, and also upon the payment of dividends until all debt requirements were met. [38 T.C. at 244.] We reached a different conclusion as to the $ 415,000 liability to Bank I, stating: Inasmuch as this indebtedness had no relevancy to the business of the corporation, was amply secured by the cash surrender value of the life insurance policies, and the lender was willing to allow sufficient time for it to be retired, we think it clear that the inclusion of the $ 415,000 indebtedness in the liabilities assumed by the corporation served no business purpose. Even if the lender had demanded immediate payment and it had been necessary to surrender the life insurance policies to satisfy the indebtedness, there is nothing in the record to indicate that this would have had any effect upon the business of the corporation. If anything, the assumption of this indebtedness was adverse to the business interests of the corporation since it was required to and did pay off an indebtedness having no relation to its organization or *551 in the conduct of its business. Although the liability for such indebtedness was assumed by the corporation, the insurance policies assigned to the bank as security for the loans were not included in the assets transferred to the corporation. [38 T.C. at 245.] See Campbell v. Wheeler, 342 F.2d 837, 840-841 (5th Cir. 1965) (assumption by corporation of taxpayer's note secured by his partnership interest which was also transferred to corporation was not for a valid business purpose where the corporation was created and the debt incurred and assumed because taxpayer was too embarrassed to withdraw funds from the partnership sufficient to pay his personal tax liability). Under the preceding authorities, we are compelled to hold that John has not shown by a clear preponderance of the evidence that HFL's assumption of the Central State Bank and Nickerson State Bank notes was for a valid business purpose.
The petitioners argue that when the banks made these loans they implicitly relief upon the assets and financial success of the Harrisons' farming operation. Therefore, when John transferred all of his assets to HFL, it was necessary for HFL to assume *552 the loans to ensure repayment. However, the notes which John owed to the banks were in effect secured by the notes owed by Delvin to John and by the mortgage and security interest which Delvin had given John to secure the latter notes. John did not transfer these assets to HFL.Further, John owned a majority of the common stock of HFL and, therefore, had the same control over the earnings of the farming enterprise as he had when it was a proprietorship.He and Carolyn were paid substantial salaries by HFL and there were no restrictions placed upon the amount of dividends or salary they could receive. The banks had been very patient in demanding payment as indicated by the various renewals John made. The Banks had substantially the same certainty of repayment after incorporation as before. When viewed from HFL's perspective, the assumption was clearly disadvantageous.The liabilities had no relation to HFL's business.HFL assumed repayment of $ 20,000 of loans without receiving any of the assets which those loans had been used to finance (the notes receivable from Delvin secured by the mortgage and security interest). John appears to have transferred away the burdens of the loans *553 transactions while retaining their benefits. He was, therefore, in a materially better financial position after than he was before the assumption. We conclude that as there was no valid business purpose for HFL's assumption of John's liabilities, the assumption constituted the receipt of money or other property within the meaning of sections 351(b) and 357(b). Accordingly, the Commissioner is sustained on this issue. Issue 2. Exclusion by Harrisons of Cost of Groceries Purchased by HFL
During 1973 and 1974, HFL purchased groceries from which Carolyn and Jane Harrison prepared meals which were consumed by the Harrison families and the summer farm help. Section 119, as in effect during the taxable years in issue, provided: SEC. 119. MEALS OR LODGING FURNISHED FOR THE CONVENIENCE OF THE EMPLOYER.
There shall be excluded from gross income of an employee the value of any meals or lodging furnished to him by his employer for the convenience of the employer, but only if-- (1) in the case of meals, the meals are furnished on the business premises of the employer, or (2) in the case of lodging, the employee is required to accept such lodging on the business premises of *554 his employer as a condition of his employment. In determining whether meals or lodging are furnished for the convenience of the employer, the provisions of an employment contract or of a State statute fixing terms of employment shall not be determinative of whether the meals or lodging are intended as compensation. In Tougher v. Commissioner, 51 T.C. 737, 744-746 (1969), affd. per curiam 441 F.2d 1148 (9th Cir. 1971), cert. denied 404 U.S. 856 (1971), we held that "groceries" are not the equivalent of "meals" and that where the employer merely furnishes the employee with groceries, section 119 is inapplicable. Respondent argues that in the instant case HFL merely provided the Harrisons with "groceries" from which they prepared their own "meals" and the meals of other farm personnel. Because of the relationships involved, we will carefully scrutinize such arrangements to ascertain whether the employer is merely purchasing groceries or whether it is actually providing meals. In the case before us, it was clearly the duty of Jane and Carolyn as corporate employees to obtain the food and prepare and serve meals which HFL provided *555 all of its employees, whether such employees were officers or not. HFL could have employed outsiders to purchase the groceries, perform the cooking, and serve the meals and no question would be raised. Under the peculiar facts of this case we conclude, therefore, that HFL served "meals" to its employees and Tougher v. Commissioner, supra, is distinguishable. Section 119 requires that meals be furnished on the business premises of the employer. We have found as a fact that the meals in question were served and consumed on the farm, which was the business premises of the employer, HFL. Finally, to be excludable, the meals must be furnished for the convenience of the employer. The Income Tax Regulations provide: Sec. 1.119-1. Meals and lodging furnished for the convenience of the employer. (a) Meals. (2) Meals furnished without a charge. (i) * * * If the employee is required to occupy living quarters on the business premises of his employer as a condition of his employment (as defined in paragraph (b) of this section), the exclusion applies to the value of any meal furnished without charge to the employee on such premises. Because, *556 as discussed below, we hold that the Harrisons were required to reside on the farm as a condition of their employment by HFL, they need include none of the cost of the groceries purchased by HFL in their gross incomes. The value of the groceries purchased by HFL and consumed by the Harrisons was an "undeniable [accession] to wealth, clearly realized, * * * over which [they had] complete dominion" and hence constituted income. Sec. 61; Commissioner v. Glenshaw Glass co., 348 U.S. 426, 431 (1955). This value is excludable, however, from their gross incomes pursuant to section 119. The value of the groceries purchased by HFL and consumed by the summer employees was not income to the Harrisons. Issue 3. Deductibility to HFL of Groceries Purchased for Harrisons and Other Employees
Section 162 allows a deduction for the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. HFL required the Harrisons to reside and eat at the farm because, as discussed below, they were needed on a 24-hour basis in order to successfully conduct the corporate business. It furnished meals and lodging to induce them to *557 reside there. It furnished meals to the summer help to induce them to perform necessary labor on the farm. These expenses were, therefore, "necessary" in that they were "appropriate and helpful" in the furtherance of HFL's business. Welch v. Helvering, 290 U.S. 111 (1933).Accordingly, HFL may deduct the cost of groceries it purchased in its fiscal years ending January 31, 1974 and 1975. Issue 4.Excludability of Cost of Utilities and Telephone Service Supplied by HFL to its Farm Property
During 1973 and 1974, HFL paid for utilities (gas and electricity) and telephone service supplied to farm property. The cost of the utilities and phone service supplied to the personal residences of the Harrisons constituted income to them, Commissioner v. Glenshaw Glass Co., supra, and must be included in their gross incomes unless specifically excluded. Commissioner v. Kowalski, 434 U.S. 77, 83 (1977). We must first decide which of the services provided by HFL (gas, electricity, and telephone) constitutes "lodging" for purposes of section 119. Commodities which are necessary to make a lodging habitable constitute "lodging." *558 Turner v. Commissioner, 68 T.C. 48, 50-51 (1977); Benninghoff v. Commissioner, 71 T.C. 216, 218 n. 2 (1978), affd. 614 F.2d 398 (5th Cir. 1980). The gas and electricity furnished to the Harrisons' residences was necessary to make them habitable, but not the telephone service. Thus, the amounts which HLF paid for the latter during 1973 and 1974 must be included in the Harrisons' gross incomes for those years. Undoubtedly some of the telephone service was attributable to HFL's trade or business and hence would not be taxable to the Harrisons. However, petitioners have provided us with no evidence as to the number or cost of business as opposed to personal calls which they made and hence have not shown that any of the telephone service was business related. Accordingly, all payments made for telephone service by HLF during 1973 and 1974 must be included in the Harrisons' gross income. Having concluded that HFL furnished "lodging" to the Harrisons by paying their gas and electric bills, we next determine if the lodging meets the following conditions of excludability set forth in section 119: (1) the lodging must be furnished for the *559 convenience of the employer; (2) the lodging must be located on the employer's business premises; and (3) the employee must be required to accept the lodging as a condition of employment. Sec. 119(2); Benninghoff v. Commissioner, supra, 71 T.C. at 218. We have no doubt that HFL furnished lodging to the Harrisons for its convenience. The farm was a seizeable operation requiring around-the-clock supervision. It unquestionably served the convenience of HFL to have employees residing thereon. The residences of the Harrisons were located on the farm; thus, the lodging furnished them by the HFL was on its "business premises." Respecting the third condition, the Income Tax Regulations state: (b) Lodging. The value of lodging furnished to an employee by the employer shall be excluded from the employee's gross income if three tests are met: (1) The lodging is furnished on the business premises of the employer, (2) The lodging is furnished for the convenience of the employer, and (3) The employee is required to accept such lodging as a condition of his employment. The requirement * * * that the employee is required to accept such lodging as a condition *560 of his employment means that he be required to accept the lodging in order to enable him properly to perform the duties of his employment. Lodging will be regarded as furnished to enable the employee properly to perform the duties of his emoloyment when, for example, the lodging is furnished because the employee is required to be available for duty at all times or because the employee could not perform the services required of him unless he is furnished such lodging.If the tests described in subparagraphs (1), (2), and (3) of this paragraph are met, the exclusion shall apply irrespective of whether * * * under an employment contract * * * such lodging is furnished as compensation. [Sec. 1.119-1(b), Income Tax Regs.] We feel that the Harrisons, to properly manage the farm, were required to reside there. Due to the unpredictable timing of many problems requiring immediate attention, (e.g., escaped cattle, broken-down milk coolers, calf-birth and bleeding udders), it was necessary that personnel be available to address them at all hours. Dairy farming is simply not a nine-to-five business. Respondent argues that prior to the adoption of the corporate resolution HFL did not require *561 the Harrisons to reside on the farm. However, as the quoted regulation makes clear, the focus is not on the existence velnon of formal documents and/or agreements but upon the nature of the duties performed by the employee. Issue 5. Deductibility by HLF of Payments for Utilities and Telephone Service
As the payments made by HLF during its fiscal years before us for gas and electricity were either (1) "lodging" supplied to the Harrisons for HFL's convenience, or (2) attributable to farming operations, they were ordinary and necessary business expenses of HFL, deductible pursuant to section 162(a). The payments HFL made for the Harrisons' telephone service did not constitute "lodging" and the Commissioner determined that they were dividends. When the Commissioner challenges the nature of corporate payments to a shareholder the determinative question is whether the shareholder actually rendered services of value equivalent to the amount of the claimed compensation. The burden of proof is upon the taxpayer to adduce evidence sufficient for the Court to determine the value of the services, if any, so rendered. Sec. 162(a)(1); Electric and Neon, Inc. v. Commissioner, 56 T.C. 1324, 1340 (1971), *562 affd. 496 F.2d 876 (5th Cir. 1974). There was no evidence as to the use of the telephone by petitioners nor was any allocation presented as to business use and personal use. HFL has not shown by a preponderance of the evidence that the telephone service payments made by HFL were intended to compensate the Harrisons for personal services actually rendered. Accordingly, the telephone service payments constituted dividends to the Harrisons and were not deductible by HFL. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: John R. Harrison and Carolyn Harrison, docket No. 1519-78; and Harrison Farms, Ltd., docket No. 1520-78.↩
2. All section references are to the Internal Revenue Code of 1954, as amended.↩
3. Respondent does not argue that the assumption was designed to avoid taxes.↩