MYRON W. MIZELL AND KAREN L. MIZELL, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Mizell v. Commissioner
Docket Nos. 27216-83; 27217-83; 27218-83.
United States Tax Court
T.C. Memo 1988-69; 1988 Tax Ct. Memo LEXIS 95; 55 T.C.M. (CCH) 169; T.C.M. (RIA) 88069; February 23, 1988. *95 A and B, physicians, were on the staff of H, a hospital. A and B frequently ate in H's cafeteria where, as staff physicians, they exercised their privilege to charge the cost of their meals. A and B also were shareholder-employees of M, a medical professional association, whose offices were in a building adjacent to H. M paid A's and B's monthly H cafeteria meal bills. Held: (1) A and B may not exclude M's monthly meal bill payments from their income under sec 119, I.R.C. 1954. (2) M may not deduct its monthly meal bill payments. (3) M's monthly meal payments are dividends to A and B. *96 John M. Carnahan, III, for the petitioners. Thomas P. O'Driscoll, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION *97 CHABOT, Judge: Respondent determined deficiencies in Federal individual and corporate income taxes against petitioners for the years and in the amounts as follows: Docket No.
Petitioner
Year
Amount
27216-83
Myron W. Mizell and
1980
$ 186.34
Karen L. Mizell
27217-83
John A. Mihalevich
1978
295.00
and Susan P. Mihalevich
1980
311.00
27218-83
Internal Medicine Associates
1980 [2]
195.00
of Springfield, Inc.
These three cases were consolidated for trial, briefs, and opinion. After concessions by petitioners in all the cases, and by respondent in the corporate petitioner's case, the issues for decision are as follows: (1) Whether the physician shareholder-employees may exclude from income under section 119[3] the amounts of the corporate shareholder's payments of their monthly meal bills at an adjacent hospital's *98 cafeteria; (2) Whether the corporate petitioner may deduct the monthly meal bill payments; and (3) Whether the corporate petitioner's monthly meal bill payments constitute dividends to the physician shareholder-employees. FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petitions were filed in the instant case, petitioner Internal Medicine Associates of Springfield, Inc. (hereinafter sometimes referred to as "IMA"), had its principal office in Springfield, Missouri; and petitioners Myron W. Mizell (hereinafter sometimes referred to as "Mizell") and Karen L. Mizell, husband and wife, and John A. Mihalevich (hereinafter sometimes referred to as "Mihalevich") and Susan P. Mihalevich, husband and wife, all resided in Springfield, Missouri. IMA was incorporated in Missouri on November 20, 1975; it provides medical care services in and around the Springfield area. During IMA's taxable year 1978, IMA's *99 shareholders were Robert Stufflebam (hereinafter sometimes referred to as "Stufflebam"), Donald Wantuck (hereinafter sometimes referred to as "Wantuck"), and Mihalevich. During IMA's taxable year 1980, IMA's shareholders were Stufflebam, Wantuck, Mihalevich, and Mizell. [4] All these shareholders were physicians and all were employees of IMA. The term "IMA's physicians" is used sometimes hereinafter to refer collectively to those individuals who, for any of the years before the Court, were physician shareholder-employees of IMA. Mizell and Mihalevich specialize in internal medicine. They treat their hospitalized patients at St. John's Regional Health Center (hereinafter sometimes referred to as "St. John's") in Springfield, pursuant to *100 an agreement providing IMA and IMA's physicians, with access to hospital facilities, equipment, and nursing staff. IMA's offices are in the National Avenue Medical Building (hereinafter sometimes referred to as "the Medical Building"), which is connected to St. John's by a third-floor walkway which is about 30 yards long. The Medical Building is owned by the National Avenue Medical Building Associates (hereinafter sometimes referred to as "NAMBA"), a partnership, and is constructed on land leased from St. John's. IMA pays rent to NAMBA for IMA's office space. IMA requires each of its physicians to make patient rounds at St. John's as part of his routine workday, in addition to seeing patients at IMA's offices. Each of IMA's physicians goes to St. John's on those workdays when his (or his fellow physicians) patients are confined for treatment. Each of IMA's physicians is associated with St. John's as a medical staff member. In this capacity they are not salaried by St. John's. [5] St. John's administration imposes no restrictions as to when IMA's physicians must make their patient rounds or conduct other IMA business in St. John's. St. John's' administration has no supervisory *101 responsibilities regarding IMA's physicians and has instituted no policies regarding the manner in which IMA's physicians provide services to their patients. [6] St John's administration does not require IMA's physicians to eat any meals in St. John's. St. John's staff members (including Mizell and Mihalevich) are required to be on "emergency room call" -- that is, available to treat patients coming to the emergency room who do not have a family physician. The emergency room call rotation is approved by the medical staff and, during the years in issue, IMA's physicians were called about two to three times per month. When on emergency room call, IMA's physicians are not required to be in the emergency room when not in actual consultation. *102 IMA's physicians can be conducting IMA business in the Medical Building and to to the emergency room when necessary. During the years in issue, there were about 200 physicians on St. John's' staff. Each physician on the staff had the privilege of signing a meal ticket or receipt for any meal taken in St. John's' cafeteria without having to pay for the meal at that time. The cafeteria meals were prepared by St. John's' employees. On an average weekday, about 50 to 60 physicians signed for their meals at breakfast and another 30 to 40 physicians signed for their meals at lunch. At the end of each month, the cafeteria manager totaled the meal tickets, determined the amount due from each physician and mailed a statement to the individual physician or the corporation, as the case may be, for payment. More than 60 percent of the physicians on St. John's' staff charged their meals and paid for them on a monthly basis. Almost all of the meals taken by the physicians in this manner were breakfasts or lunches. The cafeteria served traditional breakfast food in the morning. Each cashier was provided with a pad of sequentially numbered receipts. The cashiers were instructed to record *103 and total the price of the food items taken by the physician, total the price of the meal, and allow the physician to sign for the meal, acknowledging receipt of the listed food items. Generally, one or two cashiers were needed every morning during the sale of breakfasts. During lunch-time, generally two or three cashiers were needed. Consequently, physicians often entered the cafeteria together, went through the serving line, and, if they were served by different cashiers at the end of that line, their meal tickets would have totally unrelated numbers at the upper right-hand corner of the receipts, even though they thereafter ate their meals together in the physicians' dining room. Generally all of IMA's physicians ate breakfast and lunch together at St. John's on those days during the week when all were working. Mihalevich ate breakfast and lunch at St. John's every day that he was in the office. [7] At breakfast, Mihalevich met with IMA's other physicians. During the meal, they discussed the weekend activity, glanced at the newspaper, discussed patient care problems, and discussed sports or politics. Mihalevich then started or continued his rounds until 10 a.m., saw patients *104 in his office in the Medical Building until the morning schedule was completed, ate lunch, and then went back to his office in the Medical Building to see patients scheduled for the afternoon. The entire typical workweek was similarly scheduled. Mihalevich generally took about 15 to 20 minutes for breakfast or lunch. All meals ordered during the years in issue at St. John's by all of IMA's physicians, including Mizell and Mihalevich, were signed for by the pertinent physician. IMA had no formal agreement with St. John's to reimburse St. John's for meals. Rather, the meal tickets were delivered to IMA's offices in envelopes marked with the individual physicians' names. The monthly charges for each physician's meals were then totaled and paid by IMA. IMA did not require its physicians to eat meals at St. John's cafeteria. Each of IMA's physicians made his own decision, as to whether to take any of his meals at St. John's' cafeteria. There was no contract between IMA and St. John's for St. *105 John's to provide meals to IMA's physicians. IMA's physicians ate more than 1,100 meals at St. John's during the period October 1, 1979, through September 30, 1980. Of this number, about 70 percent were breakfasts and 30 percent were lunches. IMA paid $ 2,102 to St. John's for these meals. All but one of these meals (a $ 0.90 item for Charles L. Jobe) was for Stufflebam, Wantuck, Mihalevich, or Mizell (IMA's four shareholders). In 1980, IMA paid $ 303.75 to St. John's for Mizell's meals. In 1978 and 1980, IMA paid $ 329 and $ 523, respectively, to St. John's for Mihalevich's meals. [8]
OPINION Petitioners contend that IMA is entitled to a business expense deduction for its taxable year 1980 in the amount of $ 2,102 for payments made to St. John's for meals consumed there by IMA's physicians. [9] Petitioners maintain that under section 119, Mizell and Mihalevich are permitted to exclude from income the value of such meals consumed by them *106 during 1978 and 1980 and paid for by IMA. Respondent argues that IMA is not entitled to deduct the cost of the meals because it is not an ordinary and necessary business expense within the meaning of section 162. Rather, respondent contends that payment for the meals was an attempt by IMA to distribute profits to its shareholders by paying for their inherently personal expenses. Therefore, respondent argues, the payments for Mizell and Mihalevich constitute dividend income to the individual petitioners. Respondent further contends that the payments are not excludible under section 119 because the requirements of the statute are not met. We agree with respondent. If we were to disregard the business form that petitioners chose, we would conclude that the instant cases represent merely an effort by several physicians to deduct the modest cost of their regular day-time meals; i.e., to have "the general taxpayer * * * share in the cost of [their] daily sustenance." Moss v. Commissioner,80 T.C. 1073, 1081 (1983), *107 affd. 758 F.2d 211 (CA7 1985). Like many professionals, they occasionally "talked shop" when they met at meal-time, but they also glanced at newspapers and discussed sports or politics. On its face, these cases would appear to be classic section 262 cases, unrelieved by any considerations of business meals or travel away from home considerations. As a result, the meals would be paid for out of after-taxed money. Questions arise in the instant case because IMA's physicians chose to do business in the corporate form (i.e., by creating IMA) and wore several hats (i.e., shareholder and employee). By structuring the meals payments as corporate expenses and focussing on the employment relationship and section 119, petitioners tried to dissociate the expenses from their personal origin. Respondent, smelling abuse, apparently decided to see petitioners' bet and raise them; i.e., he determined that the meals should be paid for out of after-twice-taxed money. We note that, if IMA's payments had been characterized as compensation, then the general net effect would be that the meals would be paid for out of after-taxed money, as is true of most people's meals. However, petitioners *108 specifically disavowed any contention that there was a compensatory intent; although respondent accepted the concept as an alternative, both parties avoided introducing evidence from which the Court could fairly find a compensatory intent. Thus, the parties seem to have framed the dispute with the intent that the meals be either tax-free or double-taxed. In light of the state of the record in the instant cases, we have limited ourselves to the issues that the parties presented. See Cottle v. Commissioner,89 T.C. 467, 500 n.43 (1987); Concord Consumers Housing Cooperative v. Commissioner,89 T.C. 105, 106 n.3 (1987). The parties' expenses, and the Court's expenses in the instant cases clearly exceed the taxes disputed in these cases. With the observation that these cases are much ado about very little, we proceed to analyze the situation. I. Section 119
Section 119(a)[10] provides that the value of meals furnished to an employee by or on behalf of the employer are excluded from the employee's income under certain circumstances. *109 One of the relevant requirements for this exclusion is that the meals be furnished in kind. As the Supreme Court stated in Commissioner v. Kowalski,434 U.S. 77, 83, 84 (1977), "we hold that § 119 does not cover cash payments of any kind * * *. By its terms, § 119 covers meals furnished by the employer and not cash reimbursements for meals." (Emphasis in original.) It is clear that the meals taken by Mizell and Mihalevich in St. John's' cafeteria were not furnished by IMA in kind. The meals were prepared and sold by the staff of St. John's. Mizell and Mihalevich charged their meals as did other doctors. St. John's had no agreement with IMA to provide meals to IMA employees. Rather, Mizell's and Mihalevich's privilege of charging meals at St. John's' cafeteria derived from their status as physicians on the staff of St. John's. St. John's then periodically totaled the amounts owed by each petitioner physician and sent them bills at their IMA address. The bills were addressed to Mizell and Mihalevich personally. There is no conceptual difference between this arrangement and a cash reimbursement. Thus, we conclude that the meals in question were *110 not furnished by the employer within the meaning of section 19. Petitioners contend that Commissioner v. Kowalski, supra, is "not factually comparable to the instant case[s]", because "inclusion in the statutes of the language '. . . or on behalf of . . .' clearly indicates that the meals can be provided by a third party for the benefit of the employer." The words "or on behalf of" were inserted into the statute by section 205 of the Foreign Earned Income Act of 1978 (see sec. 201 of Pub. L. 95-615, 92 Stat. 3097, 3098). [11] The House Ways and Means Committee Report (H. Rept. 95-1463, pp. 16-17) [12] describes as follows the effect of the changes enacted by the 1978 Act: 4. Meals and lodging furnished to employees (sec. 5 of the bill and sec. 119 of the Code)
One of the requirements for exclusion of the value of meals and lodging provided by the taxpayer's employer is that the meals or lodging be furnished to the taxpayer by his employer for the convenience of the employer. The committee bill modifies the wording of this requirement to provide that the exclusion applies with respect to meals or lodging furnished by or on behalf of his employer to the taxpayer, his *111 spouse, or any of his dependents for the convenience of the employer. For example, housing provided by the client or the prime contractor on a construction job to an employee of a subcontractor for the convenience of the subcontractor would meet this requirement. However, the other requirements of section 119 must also be met for meals or lodging to be excluded by the employee. In particular, the meals and lodging must be provided in kind in conformity with the Supreme Court's decision in Commissioner v. Kowalski,98 S.Ct. 315 (1977). *112 It is apparent from the foregoing that the 1978 Act did not change the Kowalski interpretation of section 119, that the meals be provided in kind. All that St. John's cafeteria did was to sell food in the cafeteria, to permit Mizell and Mihalevich (by virtue of their relationship to St. John's) to charge their food bills, and to accept IMA's payments of Mizell's and Mihalevich's food bills. This does not satisfy the letter of the statute or the purpose of the statute, as explained in Commissioner v. Kowalski, supra, and the 1978 legislative history. We hold for respondent on this issue. [13]
II. Section 162(a)
Deductions are allowed under section 162(a)[14] for the taxpayer's ordinary and necessary expenses in carrying on a trade or business. However, because of section 262, [15] personal expenses generally are not deductible. Sharon v. Commissioner,66 T.C. 515, 522-525 (1976), affd. *113 591 F.2d 1273, 1275 (CA9 1978). Where there is a mixture of personal or family considerations and business considerations for an expenditure, special care is required in determining which considerations predominate, and whether any part of the expenditure may qualify for deduction under the dichotomy of section 162 and section 262. See Sharon v. Commissioner,66 T.C. at 524. IMA did not provide the meals to its physicians; IMA merely paid its physicians' meal bills when the bills *114 were sent by the cafeteria. IMA disclaims any intention to compensate its physicians. IMA did not direct its physicians to eat in St. John's' cafeteria. Nothing in the record indicates that IMA sought to induce its physicians to eat in St. John's' cafeteria by promising to pay the physicians' food bills if they ate there. Each of IMA's physicians exercised his own judgment, apparently day-by-day, to eat a breakfast or a lunch in St. John's' cafeteria. IMA has failed to demonstrate in the record in the instant cases any substantial business purpose of IMA that was served by IMA's payments of its physicians' meal bills. The situation is no different from that in which certain employees regularly eat meals in a restaurant convenient to their employment -- a restaurant that is neither owned by their employer, operated by their employer, leased by their employer, or in any other way under the control of their employer. To St. John's' restaurant, IMA's physicians were merely four of 200 physicians who might eat meals there and exercise the privilege of charging the meals rather than paying on the spot. In the absence of any compensatory intent, we conclude that IMA is not entitled *115 to deduct the meal payments. Moss v. Commissioner, supra.
In Moss v. Commissioner, supra, the taxpayer was a partner in a law firm whose members met every business day during the taxable years in issue at a certain cafe for lunch. During the lunches, current litigation problems, scheduling, assignments, and case settlements were discussed among the lawyers. The issue was whether the taxpayer's distributive share of the lunch expenses paid by the partnership was deductible under section 162. The taxpayer argued that the lunch expenses were deductible business expenses because they were costs incurred in earning income. Respondent argued that even though the meetings may have been ordinary and necessary to the business, the outlay was for meals, a personal living expense specifically nondeductible under section 262. In holding for respondent, we noted in Moss (80 T.C. at 1077), that in order to deduct a personal living expense under section 162, "the taxpayer must demonstrate that it was 'different from or in excess of that which would have been made for the taxpayer's personal purposes.' Sutter v. Commissioner,21 T.C. 170, 173 (1953). *116 " Even though the lunch expenses were a cost incurred in earning the lawyers' income, the luncheon meetings were considered to be part of their working day, and the individuals were not free to make alternate plans or to eat elsewhere, the taxpayer failed to prove how this restriction was any different from what is imposed on any lawyer who has to spend his or her lunch hour working. The Court noted that the "mere fact that this time is given over the noon hour does not convert the cost of daily meals into a business expense to be shared by the government." Moss v. Commissioner,80 T.C. at 1080. We believe our holding in Moss governs the result on this issue in the instant case. IMA's physicians took most of their breakfast and luncheon meals at St. John's on those days in which they were performing IMA duties. During breakfast, the physicians discussed patient care problems as well as sports, politics, and other personal matters. While St. John's billed each physician individually on a monthly basis for the meals, the bills were paid by IMA. Moreover, and unlike the facts in Moss, IMA did not require its physicians to by meals at St. John's' cafeteria. *117 Rather, they were free to eat elsewhere, bring their own food, or not eat at all. In addition, there is no clear nexus in the record between the meal expenses and the production of income. Although there is some evidence that the doctors conducted IMA business at times during the meals and received patient referrals from other doctors they saw in the cafeteria, this is not sufficient to transform inherently personal expenses into deductible business expenses. [16] In denying a deduction for the routine lunch expenses in Moss, we stated as follows (80 T.C. at 1080-1081): In the instant case, we are convinced that petitioner * * * discussed business at lunch, that the meeting was a part of their working day, and that this time was the most convenient time at which to meet. We are also convinced that the partnership benefited from the exchange of information and ideas that occurred. But this does not make his lunch deductible any more than riding to work together each morning to discuss partnership affairs would make his share of the commuting costs deductible. * * * Indeed, if petitioner is correct, only the unimaginative would dine at their own expense. *118 On answering brief, petitioners state that "While Moss is a well written decision, Petitioners do not believe that it controls." The basic reason, they say, why Moss does not control the instant cases is that Moss is not a section 119 case. However, in Moss we dealt with the implications of section 119 in deciding a section 162 case, as follows (80 T.C. at 1079-1080): The decision by the Ninth Circuit [in Sibla v. Commissioner,611 F.2d 1260 (CA9 1980), affg. 68 T.C. 422 (1977), and Cooper v. Commissioner,67 T.C. 870 (1977)] implies that similar considerations are involved in determining whether a meal is a business expense under section 162 and whether the value of a meal supplied by an employer should be included in gross income under section 61. Section 119 provides a limited exception to section 61 by allowing an employee to exclude such amounts if the meal is furnished on the business premises for the convenience of the employer. The cases decided under section 119 have focused on the degree to which the employee's actions are restricted by his employer's demands. Sibla v. Commissioner, supra at 1265; *119 Commissioner v. Kowalski,434 U.S. 77 (1977). Language referring to compliance with the demands of one's employer can also be found in section 162 cases decided by this Court. See, e.g., Moscini v. Commissioner,T.C. Memo. 1977-245 ("restrictions on the manner in which petitioner could take his meals while on duty were not so significant that they transformed an essentially personal expense into a business expense"); cf. Hirschel v. Commissioner,T.C. Memo. 1981-189. Petitioner relies on this notion of restriction in contending that the cost of the lunches, like the cost of the firehouse mess in Sibla and Cooper, should be deductible. He argues that the attorneys "considered the luncheon meetings as a part of their regular work day," and that the firm incurred the expense "solely for the benefit of its practice and not for the personal convenience of its attorneys." Petitioner has not explained, however, how this "restriction" is any different than that imposed on an attorney who must spend his lunch hour boning up on the Rules of Civil Procedure in preparation for trial or reading an evidence book to clarify a point *120 that may arise during an afternoon session. In all these cases, the lawyer spends an extra hour at work. The mere fact that this time is given over the noon hour does not convert the cost of daily meals into a business expense to be share by the Government. In addition, although the instant cases are section 119 cases in the sense that the applicability of section 119 has been raised, we point out that we have held, supra, that section 119 does not authorize Mizell and Mihalevich to exclude from their incomes the value of the meals that IMA paid for. Petitioners refer us to Harrison v. Commissioner,T.C. Memo. 1981-211. In Harrison, the individual taxpayers owned the corporate taxpayer, which owned a farm. The individual taxpayers were officers, directors and the management employees of the corporate taxpayer. The corporate taxpayer adopted a resolution requiring its officer-employees to live on the farm and remain on call for the convenience of the corporate taxpayer to deal with corporate problems and emergencies. The resolution provided that, in exchange, the corporation would pay for its officers' meals and lodging. We found that the nature of *121 the farm operation was such that it "required constant supervision and availability of personnel on a 24-hour basis to deal with varied and unpredictable farm problems." 41 T.C.M. 1384, 1386, 50 P-H Memo T.C. par. 81,211 at 81-693. The meals that were prepared on the farm were consumed there by the employees who were working there and who, because of the nature of their work, did not have an opportunity to take their meals elsewhere. We concluded that the corporate taxpayer furnished the meals and lodging to the individual taxpayers to induce the latter to reside on the farm and that the individuals' presence on the farm was needed on a 24-hour basis in order to successfully conduct the corporate business. The instant cases are like Harrison only in that in the instant cases there also is ownership of the corporate taxpayer by its officer-employees. IMA did not require its physicians to be present on a 24-hour basis and IMA did not require its physicians to eat at St. John's' cafeteria. Harrison does not help petitioners in the instant case. We hold for respondents on this issue. III. Dividends
In Mohr v. Commissioner,45 T.C. 600, 614 (1966), *122 we stated as follows: It is fundamental that where funds of a corporation are disbursed for the personal use or economic benefit of a stockholder or his immediate family, there being no intention of repayment, the amounts so disbursed are either the equivalent of corporate distributions or additional compensation for services, especially in the case of dealings between closely held corporations and their stockholders. Alex Silverman,28 T.C. 1061 (1957), affd. 253 F.2d 849 (C.A. 8, 1958).
This rule applies to a corporation's payments for its shareholders' meals, where there is not a primary business purpose. Ma-Tran Corp. v. Commissioner,70 T.C. 158, 171 (1978). In the instant cases, IMA paid for certain meals of Mizell and Mihalevich, two of IMA's shareholder-employees. Petitioners do not contend that the fair market values of these meals were less than the amounts that IMA paid for these meals. IMA's earnings and profits exceeded the amounts that IMA paid. We conclude that IMA's payments for Mizell's and Mihalevich's meals constitute *123 dividends to the latter petitioners. We hold for respondent on this issue. In order to take account of the foregoing and of concessions by the parties, Decisions in docket Nos. 27216-83 and 27217-83 will be entered for respondent.
Decision in docket No. 27218-83 will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: John A. Mihalevich and Susan P. Mihalevich, docket No. 27217-83, and Internal Medicine Associates of Springfield, Inc., docket No. 27218-83. ↩
2. Unless indicated otherwise, all references to the corporate petitioner's taxable years are to the corporate petitioner's fiscal years ending September 30.↩
3. Unless indicated otherwise, all section and chapter references are to sections and chapters of the Internal Revenue Code of 1954 as in effect for the years in issue. ↩
4. IMA's tax return for its taxable year 1980 shows Stufflebam, Wantuck, and Mihalevich as each owning 33-1/3 percent of IMA's common stock. The parties have not explained the discrepancy between the tax return and their stipulation that "During the 1980 corporate taxable year, IMA's shareholders were Drs. Robert Stufflebam, Donald Wantuck, John A. Mihalevich and Myron W. Mizell." Our findings follow the parties' stipulation on this point. ↩
5. Mizell and Wantuck had independently entered into agreements with St. John's to provide interpretative services -- that is, read echocardiograms and electrocardiograms, and act as director of pulmonary function laboratories, respectively. ↩
6. St. John's medical staff has self-imposed rules regarding the duties and responsibilities of each member of the medical staff. The by-laws are reviewed and approved by St. John's' board of trustees. ↩
7. Mizell did not testify at trial. The parties have agreed that Mizell's relevant activities in 1980 were essentially similar to those of Mihalevich and Stufflebam, who did testify. ↩
8. IMA's earnings and profits are great enough so that, if IMA's payments for Mizell's and Mihalevich's meals are to be treated as distributions with respect to their stock in IMA, then these payments are dividends. Secs. 302(c)(1) and 316. ↩
9. Petitioners specifically disclaim any contention, even in the alternative, that IMA is entitled to deduct the payments as compensation to IMA's physicians. ↩
10. SEC. 119. MEALS OR LODGING FURNISHED FOR THE CONVENIENCE OF THE EMPLOYER. (a) Meals and Lodging Furnished to Employee, His Spouse, and His Dependents, Pursuant to Employment. There shall be excluded from gross income of an employee the value of any meals or lodging furnished to him, his spouse, or any of his dependents by or on behalf of his employer for the convenience of the employer, but only if -- (1) in the case of meals, the meals are furnished on the business premises of the employer, or (2) in the case of lodging, the employee is required to accept such lodging on the business premises of his employer as a condition of his employment. ↩
11. Although Pub. L. 95-615 was not enacted until November 8, 1978, the amendments made by section 205 of the Act apply to taxable years beginning after December 31, 1977, and so apply to Mihalevich and Susan P. Mihalevich for 1978. Sec. 209(a) of Pub. L. 95-615, 92 Stat. 3097, 3109. ↩
12. Pub. L. 96-615 was H.R. 9251. H. Rept. 95-1463 accompanied H.R. 13488. After Senate passed H.R. 9251 with amendments, the House of Representatives agreed to one of the Senate amendments, with an amendment of its own. The House of Representatives' amendment was to replace the Senate's amendment with the text of H.R. 13488 (Cong. Rec. (daily ed.) September 25, 1978, p. H10683), which had just been passed by the House of Representatives (Cong. Rec. (daily ed.) September 25, 1978, p. H10677). The language that was enacted as section 205 of the Foreign Earned Income Act of 1978 is identical to the language of section 205(a) of the House of Representatives' amendment, which in turn is identical to section 5(a) of H.R. 13488. Thus, the H. Rept. 95-1463 interpretation of section 5(a) of H.R. 13488 is a proper part of the legislative history of section 205 of the Foreign Earned Income Act of 1978. ↩
13. Because we have found that the meals in question were not furnished by the employer in kind as required by section 119↩, we need not decide whether the meals were furnished for the convenience of the employer and on the employer's business premises. 14. Sec. 162(a) provides, in pertinent part, as follows:
SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In general. -- There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * * ↩
15. SEC. 262. PERSONAL, LIVING, AND FAMILY EXPENSES. Except as otherwise expressly provided in this chapter [i.e., chapter 1], no deductions shall be allowed for personal, living, or family expenses. ↩
16. While evidence was presented showing $ 55,327 in hospital-related charges, there is no evidence in the record to show that any significant portion of those charges was attributable to cafeteria-related referrals. ↩